## A98A0282. G. MANSOUR, INC. v. MANSOUR'S, INC.
### (503 SE2d 304)

POPE, Presiding Judge.

Plaintiff G. Mansour, Inc. claims that it was fraudulently induced to enter into a sublease agreement with defendant Mansour's, Inc. G. Mansour, Inc. appeals the grant of summary judgment to Mansour's, Inc. We affirm.

This case involves complicated business relationships between the various members of one family. "In determining whether the trial court properly granted summary judgment . . . we review the record de novo, construing the evidence and all inferences from the evidence strongly in favor of the nonmoving party." *Lane v. Spragg*, 224 Ga. App. 606 (481 SE2d 592) (1997). The record shows that Nasor and Mary Mansour opened Mansour's Department Store in LaGrange, Georgia in 1917. In the 1940's, the Mansours' three sons, Nasor, Jr., Alfred, Sr. and George, Sr., began working in the store and later incorporated the business under the name, Mansour's, Inc.[1] ("Mansour's"), the appellee in this case. During this period, Mansour's sold ladies', children's and men's clothing. Over time, the Mansour brothers began bringing their own sons into the business.

By 1977, however, the Mansour brothers agreed that George, Sr. would leave Mansour's and spin off the men's clothing department into his own company. Mansour's retained the ladies' and children's departments. This decision was based upon a number of factors, including George, Sr.'s belief that the merchandise he purchased for the men's department was being monitored by his brothers and his disagreement with the allocation of expenses given to that department by the store's comptroller. As a part of the spin-off from Mansour's, George, Sr. formed a new corporation, appellant G. Mansour, Inc. ("G. Mansour"), to run his men's clothing store.

At around the same time, but prior to the completion of the spin-off, George, Sr. opened a jeans store called "The Tab" as a completely independent business and formed a separate corporation called G. Mansour & Sons, Inc. to operate the store. The Tab began selling jeans products, but eventually expanded into other ladies' and children's clothing, even carrying some of the same lines as Mansour's. To that extent, therefore, it competed with Mansour's for business. Appellant G. Mansour later acquired G. Mansour's & Sons, Inc. including The Tab, and became a direct competitor of Mansour's to the extent of The Tab's business. Two of George Sr.'s sons, Beau and Jerry, left Mansour's to join him and a third son, Ricky, in running

---

[1] Throughout the relevant time, the three Mansour brothers also were shareholders and directors of Mansour Realty, Inc., but no transactions involving this corporation are at issue in the case.

the new business.

By late 1983, Mansour's had decided to open a store in Columbus, Georgia. Mansour's planned to lease 60,000 square feet of retail space in Columbus, and to designate 10,000 square feet of that space either for its own men's department or for a sublease to an outside men's store. After Mansour's had discussions with several retailers about using the space, it agreed to sublease the 10,000 square feet to G. Mansour. All the terms of this agreement were negotiated between Freddie Mansour, president of Mansour's, and Beau Mansour, then president of G. Mansour; no other Mansour family members participated in the discussions. One of the terms agreed upon at Mansour's insistence was that G. Mansour would close its jean store, The Tab. That and other terms were memorialized in a letter from Beau Mansour to Freddie Mansour in November 1983 and later incorporated into the parties' sublease.

The parties' dispute centers around terms that do not appear either in the November 1983 letter or the sublease. G. Mansour asserts that Beau and Freddie Mansour also agreed to the following terms: (1) that Mansour's would act as agent for G. Mansour in negotiating the lease agreement on the Columbus property in an effort to get a better rental rate; (2) that G. Mansour would not be allowed to negotiate directly with the property manager on the terms of its sublease; and (3) that G. Mansour would get the same rental rate in its sublease that Mansour's received on its lease. This assertion is based on conversations that George Sr., Ricky and Jerry Mansour each had with Beau Mansour and upon Ricky Mansour's recollection that Nase Mansour, an officer of Mansour's, told him when the sublease was signed that G. Mansour and Mansour's would be paying the same rental rate. Freddie Mansour denies that he and Beau ever agreed to these terms, and Nase Mansour denies making any such representation. The record contains no testimony from Beau Mansour.

On June 11, 1984, Mansour's entered into a 20-year lease agreement on the Columbus property. Under the terms of the lease, Mansour's was to pay a rental rate of $390,000 per year, or $6.50 per square foot. Mansour's and G. Mansour then entered into a renewable five-year sublease on July 25, 1994. The sublease called for an annual rental rate of $90,000 per year, or $9 per square foot. G. Mansour did not review the original lease Mansour's signed on the property before it signed the sublease, and, in fact, never asked for or saw a copy of the lease until 1992, eight years later.

The parties' sublease specifically provided that it was not to be construed as creating a relationship of principal and agent or joint venture between the parties, but simply that of lessor and lessee. The sublease also contained a merger clause that stated: "This lease contains the entire agreement between the parties concerning the

demised premises and no prior oral or written statements or representations, if any, of any party hereto or any representative of a party hereto, not contained in this lease shall have any force or effect. The lease shall not be modified or amended except by an agreement in writing executed by the parties."

G. Mansour exercised its option to renew the sublease on two occasions. The first occurred before the corporation claims it was aware of the discrepancy in rental rates and the second time occurred after it initiated litigation against Mansour's.

1. G. Mansour claims that it was fraudulently induced into signing the sublease by Mansour's misrepresentations regarding the negotiations on the property and the respective rental rates the parties were paying. "A party claiming he or she was fraudulently induced to enter a contract has two possible remedies: (1) to promptly rescind the contract after discovering the fraud and sue in tort for the recovery of the contract's consideration, as well as any other damages resulting from the fraud; or (2) affirm the contract and sue for damages resulting from the fraud. Where the party elects the second option and affirms the contract, however, he or she is bound by its terms." (Citations omitted.) *Kaye v. Ryland Group*, 228 Ga. App. 742, 743 (492 SE2d 729) (1997).

It is clear that G. Mansour has chosen the second option and affirmed the sublease. After learning that it was not paying the same rental rate as Mansour's, G. Mansour continued to conduct its business under the sublease and even renewed it for a second time.[2] " 'Ordinarily (one) who knowingly accepts and retains any benefit under a contract which he has been induced to make by fraud, after he has knowledge of such fraud, affirms the validity of the contract and will not be heard thereafter to repudiate it. [Cits.]' *Legg v. Hood*, 154 Ga. 28, 29 (2) (113 SE 642) (1922)." *Hamilton v. Advance Leasing & Rent-A-Car*, 208 Ga. App. 848, 850 (2) (432 SE2d 559) (1993).

Thus, the sublease's merger provision "would estop [G. Mansour] . . . from arguing that [it] relied on representations other than those contained in the contract." (Citations omitted.) *Kaye v. Ryland Group*, 228 Ga. App. at 743. "The presence of a merger clause . . . is determinative if the defrauded party has not rescinded but has elected to affirm the contract. . . ." (Citations and punctuation omitted.) *Hamilton v. Advance Leasing,* 208 Ga. App. at 850 (2); see *Garcia v. Charles Evans BMW*, 222 Ga. App. 121, 122 (473 SE2d 588) (1996) (a plaintiff's failure to rescind lease containing merger clause "is fatal to his claim in tort for fraud"). Under these circumstances,

---

[2] Although G. Mansour asserts in response to a request to admit that it renewed the sublease the second time "under protest of the rental rate," there is nothing in the record to reflect this protest or any reservation of rights in that regard.

G. Mansour has waived its right to rely on any alleged oral misrepresentations that Mansour's was acting as its agent or that the two companies were paying identical rental rates.

2. G. Mansour further claims that summary judgment was improper because a jury question remains as to whether a confidential relationship existed between the parties. G. Mansour contends it was relying on that relationship in signing the sublease and thus should not be bound by the terms of the agreement. However, "[i]t is well established that 'the mere fact that one reposes trust and confidence in another does not create a confidential relationship. In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone.' (Citations and punctuation omitted.) *Kienel v. Lanier*, 190 Ga. App. 201, 203 (2) (378 SE2d 359) (1989). Moreover, courts have held that a confidential and fiduciary relationship is not presumed between brothers or close, personal friends, but 'must be shown by proof, and the burden is upon the party asserting the existence of such relationship to affirmatively show the same.' (Citation and punctuation omitted.) *Hancock v. Hancock*, 223 Ga. 481, 486 (1) (c) (156 SE2d 354) (1967); *Charles v. Simmons*, 215 Ga. 794 (1) (113 SE2d 604) (1960)." *Harish v. Raj*, 222 Ga. App. 248, 250 (1) (474 SE2d 624) (1996) (affirming trial court's summary judgment to defendant on issue of confidential relationship).

Even if G. Mansour could show the parties " 'owed each other a fiduciary duty in other respects, there is no basis in this case for an inference that a fiduciary or confidential relationship existed between them *with respect to the transaction at issue*.' (Emphasis in original.) [Cit.]" *Allen v. Hub Cap Heaven*, 225 Ga. App. 533, 537 (4) (484 SE2d 259) (1997). Although the Mansour family had a history of intertwined business dealings, the record demonstrates that in this transaction the parties were operating at arms' length. Mansour's made the decision to open a store in Columbus completely independent of G. Mansour. George Mansour, Sr. and Jerry Mansour testified that they learned of Mansour's decision to move to Columbus by reading about it in the paper and that Mansour's was committed to go to Columbus before it began talking to G. Mansour. Mansour's spoke with several retailers before negotiating with G. Mansour to sublease the extra space in Columbus. Mansour's and G. Mansour were to some extent competitors during the time of the negotiations, and Mansour's required the closing of G. Mansour's competing store as a condition for the sublease. Further, Ricky Mansour testified that he was concerned that G. Mansour did not have its own attorney review the sublease at the time it was signed because Mansour's and G. Mansour were on different "sides" of the sublease.

The sublease, therefore, was not part of a transaction in which

the parties " 'joined together as partners, promoters, joint venturers, or otherwise, to achieve a common business objective. Rather, the parties were engaged in a transaction *with each other* in an effort to further their own separate business objectives. Under such circumstances, (one party) was not under any duty to represent or advance the (other's) interests. [Cit.]' (Emphasis in original.)" Id. Under these circumstances, the trial court correctly could have found that no confidential relationship existed as a matter of law.

*Judgment affirmed. Ruffin, J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED JUNE 17, 1998.

*Denney, Pease, Allison & Kirk, John W. Denney, Elizabeth S. Morgan,* for appellant.

*Willis, McKenzie & Long, Charles J. Willis, Dewey R. McKenzie, Jr.,* for appellee.