A10A1820. ARKO v. CIROU et al.
(700 SE2d 604)

BLACKBURN, Senior Appellate Judge.

In this action to collect a debt, lender Robert Arko appeals the summary judgment granted to debtors Martin and Gail Cirou,

arguing that modifications to the debt instruments, although executed by him, were invalid. We agree with the trial court that because no evidence showed a confidential relationship between him and the Cirous, Arko's decision not to read the modifications before executing them rendered such arguments meritless. Accordingly, we affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. *Matjoulis v. Integon Gen. Ins. Corp.*[1]

So viewed, the evidence shows that Arko, a successful businessman, came to know the Cirous (who ran a construction business) when they satisfactorily remodeled a portion of Arko and his wife's home in 2003. The two couples soon became close friends who often socialized together. Arko later loaned the Cirous $450,000 to finance their constructing a house in the Garrison Oaks neighborhood, which debt was repaid.

On September 21, 2005, Arko loaned the Cirous $1 million to finance their constructing a house on Spalding Drive. The debt instruments included a $1 million note (with interest at one over prime) and a security deed on the Spalding property. In June 2006, Arko loaned the Cirous an additional $200,000 for the house's construction, and the parties orally amended the note to increase the principal amount to $1.2 million and also executed a new deed to secure debt on the Spalding property to reflect this increased amount.

The Cirous made timely interest payments each month but paid no principal, as the principal was to be paid in full upon the note's maturity. When the note matured in March 2007, the Cirous failed to repay the principal but nevertheless continued making interest payments. Arko, who still enjoyed a close friendship with the Cirous, became concerned and in December 2007 asked for a new note with a new maturity date. The Cirous agreed and asked Arko if he would discharge the security deed on the Spalding property for tax purposes, in exchange for which they would give him a security deed on other property they owned (the "Bell Park property"). Arko agreed to such.

In the meantime, Arko's wife had become gravely ill, leading to her death on January 24, 2008. The Cirous were deeply involved in

---

[1] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459, 459 (1) (486 SE2d 684) (1997).

consoling and assisting Arko during this time. On February 2, 2008 (mere days after the funeral), the Cirous presented Arko with the documents which allegedly reflected the parties' December 2007 discussions. The Cirous executed a new note in the principal amount of $1.2 million at the same interest rate (one over prime) and with a maturity date of March 1, 2010. Without reading any of the documents, Arko executed a discharge of the security deed on the Spalding property, which discharge expressly stated that the debt underlying the September 2005 security deed (having been increased to $1.2 million by the June 2006 transaction) was fully paid and cancelled. Even though the Bell Park property was mentioned in the new note, the Cirous gave Arko no security deed on the Bell Park property or on any other property to secure the new debt. The only document Arko took away from the February 2008 transaction was the original of the new note; he was not given a copy of the document discharging the security deed on the Spalding property.

In August 2008, Arko became concerned that he had no copy of any security deed securing the February 2008 $1.2 million note. In September 2008, he asked the Cirous for the security deed securing the February 2008 note, which deed he mistakenly believed had been executed in February 2008 and which he believed would encumber the Bell Park property. At this point, he began to distrust the Cirous, not only because they dragged their feet on producing the security deed but also because he suspected that the Cirous had recently stolen $200 left behind following a card game in which he and they had participated.

Finally, on October 17, 2008, the parties met at a notary's office, where the Cirous executed a security deed to secure the February 2008 $1.2 million note. However, the security deed was not on the Bell Park property but was on the Cirous' property in the Garrison Oaks neighborhood, which property already had two liens on it. Moreover, the security deed expressly stated that the February 2008 debt being secured was nonrecourse, with the only remedy for collection being a foreclosure on the property. Indeed, while at the notary's office, Arko — again without reading the document — signed an agreement amending the February 2008 $1.2 million note, expressly making it a nonrecourse note. The October agreement further provided that the only property securing this debt would be the Garrison Oaks property of the Cirous and that any references to other properties were stricken from the note.

A month later, Arko filed the present lawsuit, seeking to rescind the February 2008 discharge document and the October 2008

amendment agreement.[2] Beyond seeking to set aside instruments, the complaint requested a judgment for $1.2 million on the September 2005 note, asked for an equitable lien on the Bell Park property, and asserted a claim of unjust enrichment. Arko filed notices of lis pendens on the Spalding and Bell Park properties respectively. The Cirous answered, asserting a counterclaim for breach of contract, fraud, slander of title, attorney fees, and requesting a removal of the lis pendens. Following discovery, the Cirous filed a motion for summary judgment on all of Arko's claims and a motion to cancel the two lis pendens, both of which motions were granted. The counterclaims remained to be decided. Arko appeals.

1. Arko first contends that the trial court erred in granting summary judgment on his claims (i) to rescind the February 2008 document discharging the September 2005 security deed[3] and declaring as paid in full the September 2005 note, (ii) to rescind the October 2008 agreement amending the February 2008 $1.2 million note to be nonrecourse and to be secured by the Garrison Oaks property only, and (iii) to seek an equitable lien on the Bell Park property if the October 2008 agreement only were cancelled. Arko contends that he was fraudulently induced to sign the February and October 2008 agreements, which he did not read because he relied on his trusted friends the Cirous. We agree with the trial court that Arko was not excused from reading the documents and that he is bound to their terms.

> The rule in this state is that where one who can read signs a contract without reading it, he is bound by the terms thereof, unless he can show that an emergency existed at the time of signing that would excuse his failure to read it, or that the opposite party misled him by an artifice or device which prevented him from reading it, or that a fiduciary or confidential relationship existed between the parties upon which he relied in not reading the contract.

(Punctuation omitted.) *Kienel v. Lanier*.[4] See *Stamps v. JFB Prop-*

---

[2] Although the complaint did not expressly pray to rescind the October 2008 agreement signed by Arko, the fraud allegations of the complaint supported such a rescission. See *Conway v. Romarion*, 252 Ga. App. 528, 532 (1) (557 SE2d 54) (2001). Arko's response brief opposing summary judgment expressly sought to rescind this agreement.

[3] Arko's argument that the June 2006 security deed survived the February 2008 discharge is misplaced, as the debt underlying that deed – the $1.2 million note as amended – was expressly paid in full and cancelled in the discharge document executed by Arko. Under its own terms, the June 2006 security deed was cancelled as of the date that debt was fully paid.

[4] *Kienel v. Lanier*, 190 Ga. App. 201, 202-203 (2) (378 SE2d 359) (1989).

*erties.*[5] "A party to a contract who can read must read, or show a legal excuse for not doing so. Fraud which would relieve a party who could read must be such as prevents him from reading." *Wynn v. First Nat. Bank of Newnan.*[6]

Based on this doctrine, "[o]ne having the capacity and opportunity to read a written contract cannot afterwards set up fraud in the procurement of his signature to the instrument." *Craft v. Drake.*[7] See *Campbell v. Citizens & Southern Nat. Bank*[8] ("[o]ne not prevented from reading the contract, and having the capacity and opportunity to do so, cannot after signing it claim he was fraudulently induced to sign by promises which contradict the express terms of the contract"). "It [is] incumbent upon [a party] to exercise ordinary diligence to make his own independent verification of the contractual terms and his failure to do so bars an action based on fraud." *Fuller v. Greenville Banking Co.*[9] See *Pruett v. Commercial Bank of Ga.*[10] (party cannot claim that terms of agreement should have been explained to him). "He is likewise not entitled to equitable relief where, by exercising slight diligence, he could have prevented the fraud which he alleges to have been perpetrated upon him." *Stacey Realty, Inc. v. Calvary Baptist Church.*[11]

It is undisputed that Arko, a successful businessman, could have read the documents, that no emergency existed at the time he executed the documents, and that the Cirous did nothing to prevent him from reading the documents. Arko's argument that he did not have his reading glasses with him at the times the documents were signed bears no weight. See *Hancock v. Gunter*[12] ("the absence of [plaintiff's] glasses did not excuse him for relying upon representations of the defendant as to the nature and content of the papers he signed"). See also *Smith v. Standard Oil Co.*[13] ("[t]he fact that the appellant did not have her magnifying glass with her would not justify her failure to read the instrument since no emergency was shown making it necessary that she sign it without delay").

Thus, Arko's primary argument on appeal is that his close,

---

[5] *Stamps v. JFB Properties*, 287 Ga. 124, 126 (694 SE2d 649) (2010).

[6] *Wynn v. First Nat. Bank of Newnan*, 176 Ga. 218, 218 (2) (167 SE 513) (1933).

[7] *Craft v. Drake*, 244 Ga. 406, 408 (260 SE2d 475) (1979).

[8] *Campbell v. Citizens & Southern Nat. Bank*, 202 Ga. App. 639, 640 (1) (415 SE2d 193) (1992).

[9] *Fuller v. Greenville Banking Co.*, 230 Ga. App. 63, 65 (1) (495 SE2d 320) (1997).

[10] *Pruett v. Commercial Bank of Ga.*, 206 Ga. App. 103, 104 (424 SE2d 284) (1992).

[11] *Stacey Realty, Inc. v. Calvary Baptist Church*, 188 Ga. App. 822, 824 (1) (374 SE2d 537) (1988).

[12] *Hancock v. Gunter*, 195 Ga. 646, 652 (4) (24 SE2d 772) (1943), citing *Lewis v. Foy*, 189 Ga. 596, 599-600 (6 SE2d 788) (1940).

[13] *Smith v. Standard Oil Co.*, 227 Ga. 268, 273 (4) (180 SE2d 691) (1971).

personal friendship with the Cirous established a confidential relationship which excused his not reading the documents. We agree with the trial court that Arko, who bore the burden of affirmatively proving the confidential relationship (see *Parello v. Maio*[14]), presented no evidence of such.

OCGA § 23-2-58 defines a confidential relationship as one

> where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

There is no evidence that the Cirous exercised any controlling influence over the will or conduct of Arko. Arko was undisputedly an experienced businessman who had engaged in sophisticated business transactions previously, including one in which he had sold his security business for millions of dollars. Compare *Mullis v. Mullis*[15] (brother-in-law took advantage of an elderly widow whose husband had just died to have her deed to him her entire estate; evidence showed mental disparity between parties, including the widow's crying at the bank and not even being able to remember the transactions). He had agreed to the discharge of the Spalding property in December 2007 before his wife passed away, and the October 2008 transaction affirming and amending the February 2008 note and discharge took place nine months after his wife's death and several weeks after he had begun to distrust the Cirous. Nor is there any evidence that the parties were partners, that the Cirous were acting as Arko's agent, or that any similar fiduciary relationship existed between the parties. Compare *Stamps*, supra, 287 Ga. at 124-125 (parties had previously enjoyed an attorney-client relationship, and the attorney had more recently acted on the other's behalf in attempts to secure funds).

Rather, Arko focuses solely on his close, personal friendship with the Cirous as evidence establishing a confidential relationship. But our Court has repeatedly held that such friendships cannot alone create a confidential relationship. See *Smith v. Walden*[16] ("mere friendship and close fellowship, without more, do not create a fiduciary relationship"); *Harish v. Raj*[17] ("a confidential and fidu-

---

[14] *Parello v. Maio*, 268 Ga. 852, 854 (1) (494 SE2d 331) (1998).
[15] *Mullis v. Mullis*, 245 Ga. App. 845, 845-846 (1) (539 SE2d 189) (2000).
[16] *Smith v. Walden*, 249 Ga. App. 757, 758 (549 SE2d 750) (2001).
[17] *Harish v. Raj*, 222 Ga. App. 248, 250 (1) (474 SE2d 624) (1996).

ciary relationship is not presumed between ... close, personal friends. . . . Thus, while [the parties] grew up in the same community and were close friends, this fact alone does not support the finding of a confidential or fiduciary relationship"); *Norris v. Hart*[18] ("[t]hat the defendant was or had been a friend of the plaintiff, would not alone create a relation of trust or confidence between them"). Indeed, *Phipps v. Wright*[19] held that no confidential relationship was shown by similar allegations that

> the plaintiff was "lulled into a sense of security" by reason of the fact that the defendant lived in the same community, as her friend and neighbor, that during such long period of "friendship" she had "every reason to believe, and did believe, in his honesty, sincerity, veracity, and straightforwardness," that she had "implicit faith in his truthfulness, and by reason of trust and confidence in him purchased said property, and accepted in so doing defendant's statements and representations as a self-evident truth."

(Punctuation omitted.)

Our Court has particularly emphasized that there is no confidential relationship between close friends with regard to a transaction in which they are not joined together as partners, promoters, joint venturers, or otherwise to achieve a common business objective, but instead are "engaged in a business transaction *with each other* in an effort to advance their own separate objectives." (Emphasis supplied.) *Walden*, supra, 249 Ga. App. at 758. See *G. Mansour, Inc. v. Mansour's, Inc.*;[20] *Kienel*, supra, 190 Ga. App. at 204 (2). Here, Arko was plainly seeking to receive a return on his money through a "one over prime" interest rate, whereas the Cirous were seeking to build a house for resale and profit. "The mere fact that [Arko] repose[d] trust and confidence in [the Cirous did] not create a confidential relationship." (Punctuation omitted.) *Kienel*, supra, 190 Ga. App. at 203 (2). See *Harish*, supra, 222 Ga. App. at 250 (1). We cannot agree with Arko that the fact that the same attorney prepared the September 2005 documents and the October 2008 documents was relevant to showing a confidential relationship between Arko and the Cirous. "Under these circumstances, the trial court correctly ... found that no confidential relationship existed as a matter of law." *G. Mansour, Inc.*, supra, 233 Ga. App. at 11 (2). Even though our sympathy is with Arko, Georgia law is clear that

---

[18] *Norris v. Hart*, 74 Ga. App. 444, 446 (40 SE2d 96) (1946).

[19] *Phipps v. Wright*, 28 Ga. App. 164, 164 (4) (110 SE 511) (1922).

[20] *G. Mansour, Inc. v. Mansour's, Inc.*, 233 Ga. App. 7, 10-11 (2) (503 SE2d 304) (1998).

summary judgment for the Cirous was mandated on Arko's claims that relied on the trial court's undoing the February and October 2008 agreements that he executed. See id.

2. Arko claims that his unjust enrichment claim should have survived even if the trial court were correct that the February and October 2008 agreements were valid and binding. However, "[a]n unjust enrichment theory does not lie where there is an express contract." (Punctuation omitted.) *Donchi, Inc. v. Robdol, LLC.*[21] Because we hold that the February and October 2008 agreements were valid and controlling, the trial court did not err in granting summary judgment as to Arko's unjust enrichment claim. Id. See *Fulton County v. Southern Hope Humane Society.*[22]

3. Arko next complains that the trial court erred in cancelling the lis pendens on the Spalding and Bell Park properties. He first relies on his claims that the February and October 2008 transactions should have been undone, in which transactions the parties had agreed that only the Garrison Oaks property would serve as security. As shown above, these claims fail. He next relies on the procedural argument that under OCGA § 44-14-612, the court should not have cancelled the lis pendens but should have only ordered the clerk of the court to indicate on the face of the lis pendens record that judgment had been entered in favor of the Cirous. This argument is correct. As stated in *Bellamy v. Fed. Deposit Ins. Corp.,*[23]

> OCGA § 44-14-612 now directs the clerk to indicate on the face of the recorded lis pendens notice a dismissal, settlement, or final judgment entered in the underlying action and the book and page in the records where such final order or judgment is to be found. . . . The reason that the notice for lis pendens is now marked on the face of the notice as to disposition rather than physically canceled or removed is that the judgment in the underlying action may be set aside, new trial granted, or appealed so that the action could be revived later and the notice of lis pendens still provide warning to potential purchasers.

(Citation and punctuation omitted.)

However, the trial court's error is harmless in that our disposition of the merits against Arko would render ineffectual any effort to

---

[21] *Donchi, Inc. v. Robdol, LLC*, 283 Ga. App. 161, 167 (4) (640 SE2d 719) (2007).

[22] *Fulton County v. Southern Hope Humane Society*, 302 Ga. App. 638, 640 (2) (691 SE2d 393) (2010).

[23] *Bellamy v. Fed. Deposit Ins. Corp.*, 236 Ga. App. 747, 753-754 (4) (d) (512 SE2d 671) (1999).

set aside the trial court's summary judgment. There is no new trial to be granted. And after our remittitur is transmitted to the trial court, no further appeal on these issues is possible. Thus, there is no need to provide any warnings to potential purchasers. It is therefore unnecessary to reverse the trial court's order.

*Judgment affirmed. Barnes, P. J., and Smith, P. J., concur.*

DECIDED AUGUST 5, 2010 —
RECONSIDERATION DENIED SEPTEMBER 1, 2010 — 

*Weinstock & Scavo, Michael Weinstock, James R. Fletcher II*, for appellant.

*Richard L. Robbins, Jason Alloy*, for appellees.