A11A2350. SPEEDWAY MOTORSPORTS, INC. et al.
v. PINNACLE BANK.
A11A2351. SPEEDWAY MOTORSPORTS, INC. et al.
v. BLIHOVDE et al.
A11A2352. SPEEDWAY MOTORSPORTS, INC. et al.
v. BLIHOVDE et al.
(727 SE2d 151)

BLACKWELL, Judge.

Between April 2006 and September 2010, David R. Blihovde, Jr., allegedly defrauded Speedway Motorsports, Inc. and its subsidiary, Speedway Motorsports International, Ltd., of more than $5 million. Speedway[1] discovered the fraud after Blihovde died in October 2010, and about a month later, it filed a lawsuit against several individuals and businesses to whom Blihovde allegedly had diverted the proceeds of his fraud, seeking damages for unjust enrichment, the avoidance of certain transfers under the Uniform Fraudulent Transfers Act, OCGA § 18-2-70 et seq., the recognition of constructive trusts or equitable liens on assets acquired with the proceeds of the fraud, and a declaratory judgment that such assets are the property of Speedway. The court below found that Speedway failed to state a claim against several of these defendants upon which relief properly might be granted, and it dismissed those claims. Speedway appeals from these dismissals.[2]

The standard for a dismissal under OCGA § 9-11-12 (b) (6) for failure to state a claim is settled and familiar. At a minimum, a complaint must contain "[a] short and plain statement of the claims showing that the pleader is entitled to relief," OCGA § 9-11-8 (a) (2) (A), and "this short and plain statement must include enough detail to afford the defendant fair notice of the nature of the claim and a fair opportunity to frame a responsive pleading." *Benedict v. State Farm Bank, FSB*, 309 Ga. App. 133, 134 (1) (709 SE2d 314) (2011) (citations omitted). If the complaint gives fair notice, "it should be dismissed for failure to state a claim only if . . . its allegations disclose with certainty that no set of facts consistent with the allegations could be proved

---

[1] There is no need in these appeals to distinguish between Speedway Motorsports, Inc. and Speedway Motorsports International, Ltd., so, to keep it simple, we will refer to both as "Speedway."

[2] In Case No. A11A2350, Speedway appeals from the dismissal of its claims against Pinnacle Bank, which held a security interest in real property that Blihovde allegedly acquired with the proceeds of his fraud. In Case No. A11A2351, Speedway appeals from the dismissal of its claims against Deborah Blihovde, who was married to Blihovde prior to November 2007, and their adult children, Brent and Ashley Blihovde. In Case No. A11A2352, Speedway appeals from the dismissal of its claims against Wenona Rae Blihovde, who was married to Blihovde at the time of his death, and their minor child, P. B.

that would entitle the plaintiff to the relief he seeks." Id. (citation and punctuation omitted). "Put another way, if, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff, the complaint is sufficient." Id. (citation and punctuation omitted). "Like the court below, when we assess the sufficiency of the complaint on appeal, we must accept the allegations of fact that appear in the complaint and view those allegations in the light most favorable to the plaintiff."[3] *Bush v. Bank of N. Y. Mellon*, 313 Ga. App. 84, 89 (720 SE2d 370) (2011). And on appeal from the dismissal of a complaint, we owe no deference to the decision of the court below, and we must decide for ourselves whether the complaint states a claim upon which relief might properly be granted. See *Benedict*, 309 Ga. App. at 134 (1).

According to its second amended complaint,[4] Speedway, in March 2004, hired Oasis Trading Group, LLC, of which Blihovde was a member, to provide consulting services to Speedway about opportunities in the petroleum products business. Speedway advanced funds to Oasis each month for expenses incurred in connection with these consulting services, and Blihovde prepared invoices to Speedway reflecting these expenses. Beginning in 2006, Blihovde misrepresented these expenses and sent fraudulent invoices to Speedway, and when Speedway advanced funds for these expenses, he misappropriated substantial portions of the advances for himself. By September 2010, Blihovde had obtained more than $5 million from Speedway by his fraud. Then, on September 30, 2010, Speedway notified Oasis that it intended to discontinue its monthly advances of expenses. About a week later, Blihovde died, and soon thereafter, Oasis discovered the fraud and disclosed it to Speedway. We turn now to the specific claims asserted by Speedway that the court below dismissed.

## Case No. A11A2350

1. In September 2008, Blihovde purchased a residence in Gwinnett County for nearly $1.5 million. According to Speedway, Blihovde

---

[3] Because we must accept the facts that Speedway alleges in its complaint, and because we must view its allegations in the light most favorable to Speedway, the "facts" set out in this opinion are only allegations of fact. These "facts" have yet to be proven, and it may turn out that the "facts" we accept for the purposes of these appeals are not accurate. See *Hudson v. Hall*, 231 F3d 1289, 1292 (I) (A), n. 2 (11th Cir. 2000). We express no opinion about the credibility of any facts alleged by Speedway, nor do we speculate about the likelihood of Speedway being able to present evidence to support some of the allegations contained in its complaint.

[4] Speedway amended its complaint twice before the court below entered its orders of dismissal, and for this reason, we look to the allegations of the second amended complaint.

used the proceeds of his fraud to pay a part of the purchase price, and he borrowed $1.2 million from Pinnacle Bank to pay the rest.[5] In connection with his purchase of the residence, Blihovde gave a security interest in the residence to the Bank, and he used the proceeds of his fraud to purchase mortgage insurance for the benefit of the Bank. Blihovde subsequently used more than $200,000 that he obtained by his fraud to make improvements to this residence. In February 2011, the Bank foreclosed its security interest and acquired title to the residence.[6] Based on these allegations, Speedway sued the Bank, contending that the Bank was unjustly enriched by the interests that Blihovde conveyed to it, that the conveyance of such interests are avoidable as fraudulent transfers, and that Speedway has a constructive trust and equitable lien upon the residence, which have priority over the Bank's security interest and survive the foreclosure. On the motion of the Bank, the court below dismissed the claims against it, and we affirm in part and reverse in part.

As our Supreme Court has explained, "a bona fide purchaser for value is protected against outstanding interests in land of which the purchaser has no notice[, and] a grantee in a security deed who acts in good faith stands in the attitude of a bona fide purchaser, and is entitled to the same protection." *Brock v. Yale Mtg. Corp.*, 287 Ga. 849, 852 (2) (700 SE2d 583) (2010) (citations and punctuation omitted). Similarly, the Uniform Fraudulent Transfers Act provides that a fraudulent transfer is not voidable under OCGA § 18-2-74 (a) (1) against "a person who took in good faith and for a reasonably equivalent value." OCGA § 18-2-78 (a). For these reasons, the Bank says, the claims that Speedway asserts against it fail. Perhaps anticipating that the Bank would assert these defenses,[7] Speedway alleged in its second amended complaint that the Bank should be charged with constructive knowledge that Blihovde had defrauded Speedway, averring that Blihovde made false representations on his

---

[5] More specifically, Speedway alleges that Blihovde acquired the residence for $1.469 million, that Blihovde "used the misappropriated funds to acquire" the residence, and that the Bank loaned $1.2 million to Blihovde in connection with the purchase of the residence. Given our obligation to construe the pleadings in the light most favorable to Speedway, we understand Speedway to allege that Blihovde made a down payment on the residence with the proceeds of his fraud and paid the remainder of the purchase price with funds that he borrowed from the Bank.

[6] No allegation about the foreclosure appears in the second amended complaint, but everyone seems to agree that the foreclosure occurred, so we will accept that it did for the purposes of this appeal.

[7] The courts have acknowledged that these are defenses. See, e.g., *Henson v. Bridges*, 218 Ga. 6, 10 (2) (126 SE2d 226) (1962) (bona fide purchaser for value); *Kitchings v. Ameris Bank*, 309 Ga. App. 837, 837 (711 SE2d 392) (2011) (bona fide purchaser for value); *Warfield v. Byron*, 436 F3d 551, 558 (III) (B) (5th Cir. 2006) (good faith and reasonably equivalent value).

loan application to the Bank, that these representations would have caused a reasonable lender to make further inquiries, that the Bank had a duty to make such inquiries, and that such inquiries would have revealed the fraud. If the Bank were to be charged with knowledge of the fraud, of course, it might be sufficient to overcome these defenses. On appeal, however, the Bank vigorously disputes that it owed any duty to Speedway to make further inquiry about the loan application, even accepting, for the sake of argument, the allegation that the application was suspicious. About this, perhaps the Bank is right,[8] but it simply does not matter for the purposes of this appeal.

Whether or not Speedway has alleged facts in its second amended complaint that, if true, would be sufficient to disprove these defenses, a plaintiff has no obligation to anticipate and plead away any defenses in his complaint. See OCGA § 9-11-8 (a) (2) (complaint requires "short and plain statement of the claims" and "demand for judgment"). A motion to dismiss for failure to state a claim can properly be granted upon an affirmative defense only when the elements of the defense are admitted by the plaintiff or "completely disclosed on the face of the pleadings." *Murrey v. Specialty Underwriters*, 233 Ga. 804, 807 (213 SE2d 668) (1975). See also *Ghertner v. Solaimani*, 254 Ga. App. 821, 825, n. 4 (563 SE2d 878) (2002) ("Where the facts necessary to establish an affirmative defense are admitted or not controverted, the court may dispose of the matter upon a motion to dismiss. . . ."); *Liner v. North*, 194 Ga. App. 175, 179 (2) (390 SE2d 263) (1990) (affirmative defense "may be properly raised by motion where the facts are admitted or are not controverted or are completely disclosed on the face of the pleadings") (citation and punctuation omitted); *Flanders v. Georgia Farm Bureau Mut. Ins. Co.*, 171 Ga. App. 188, 188-189 (318 SE2d 794) (1984) (same). Consequently, if the facts alleged in the complaint affirmatively prove a defense, a court may dismiss the complaint based upon the defense, but if the facts alleged in the complaint merely fail to affirmatively disprove a defense, no dismissal is warranted. Here, the allegations of the second amended complaint may or may not *disprove* the defenses on which the Bank relies, but they do not affirmatively *prove* those defenses.[9] For these reasons, we reverse the dismissal of the claims against the Bank under the Uniform Fraudulent Transfers

---

[8] We offer no opinion about whether the Bank owed any duty to investigate the loan application further before funding the loan.

[9] Nowhere in the second amended complaint does Speedway allege, for instance, that the Bank did not have notice of its alleged interest in the residence or that the Bank acted in good faith when it took a security interest in the residence.

Act and for a constructive trust, equitable lien, and declaratory judgment, as well as the derivative claim for attorney fees and expenses of litigation.

The claim against the Bank for unjust enrichment, however, properly was dismissed. Speedway admitted in its second amended complaint that the Bank, in fact, loaned $1.2 million to Blihovde, and there is no allegation that Blihovde gave any value to the Bank except that to which it was entitled under the terms of the loan. Accordingly, the second amended complaint shows that the Bank has received nothing in the nature of a windfall and has not, therefore, been unjustly enriched. See *Eastside Carpet Mills v. Dodd*, 144 Ga. App. 580, 581 (241 SE2d 466) (1978) ("[T]he bank was not unjustly enriched, having received only those funds to which it was entitled as a result of its loan. . . ."). For this reason, we affirm the dismissal of the unjust enrichment claim against the Bank.

### Case Nos. A11A2351 and A11A2352

2. In November 2007, Blihovde purchased a policy of insurance upon his own life, naming Deborah Blihovde, his ex-wife, as the beneficiary.[10] According to Speedway, Blihovde used the proceeds of his fraud to purchase this policy. In October 2010, just a few days before he died, Blihovde submitted a change of beneficiary to his insurer, naming Deborah, his two adult children by Deborah, and his minor child by his subsequent marriage to Wenona Blihovde as the beneficiaries. After his death, Deborah and his adult children sought payment of the proceeds of the policy. Based on these allegations, Speedway sued Deborah and the children, asserting that they were unjustly enriched by their receipt of the life insurance proceeds and that it is equitably entitled to the proceeds of the policy, at least up to the amount of the premiums paid with funds that Blihovde acquired by his fraud.

In response, Deborah and the children pointed to OCGA § 33-25-11 (a), which, they say, puts the proceeds of the insurance policy out of the reach of Speedway as a matter of law. In pertinent part, OCGA § 33-25-11 (a) provides:

> Whenever any person residing in the state shall die leaving insurance on his or her life, such insurance shall

---

[10] Actually, according to the second amended complaint, Blihovde and Deborah still were married on November 5, 2007, when the policy was issued. But a divorce proceeding then was pending, and a final decree of divorce was entered only a few weeks later. So, to keep it simple, we refer to Deborah as an ex-wife.

inure exclusively to the benefit of the person for whose use and benefit such insurance is designated in the policy, and the proceeds thereof shall be exempt from the claims of creditors of the insured unless the insurance policy or a valid assignment thereof provides otherwise. . . .[11]

Speedway replied that it is not a "creditor," as that term is used in the statute, and that OCGA § 33-25-11 (a), therefore, is no impediment to its claims upon the life insurance proceeds. Speedway reasoned that it is not a "creditor" because, as the unwitting victim of a fraud, it never voluntarily undertook to extend credit to Blihovde. On the motion of Deborah and the children, the court below dismissed the claims on the life insurance proceeds, and although it is a difficult question, we conclude that OCGA § 33-25-11 (a) precludes any claims in this case against the proceeds of the life insurance policy. Accordingly, we affirm the dismissal of those claims.

We begin with the settled principle that, "[i]n all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy." OCGA § 1-3-1 (a). "And when we search for this intention, we always must presume that the General Assembly means what it says and says what it means." *Northeast Atlanta Bonding Co. v. State of Ga.*, 308 Ga. App. 573, 577 (1) (707 SE2d 921) (2011). As our Supreme Court has explained, the search for legislative intent must begin with the words of the statute, and if those words are clear and unambiguous, it also must end there. See *Opensided MRI of Atlanta v. Chandler*, 287 Ga. 406, 407 (696 SE2d 640) (2010) ("When a statute contains clear and unambiguous language, such language will be given its plain meaning and will be applied accordingly.") (citation omitted). See also *Frazier v. Southern R. Co.*, 200 Ga. 590, 593 (2) (37 SE2d 774) (1946) ("[Appellate courts] must frequently construe the language of a statute, but such courts may not substitute by judicial interpretation language of their own for the clear, unambiguous language of the statute, so as to change the meaning."). In this case, however, the meaning of "creditor," as that term is used in OCGA § 33-25-11 (a), is uncertain and ambiguous.

"Creditor" is a term that appears in several sections of our Code, but it does not always have precisely the same meaning. As our Supreme Court has explained, the term sometimes is attributed its "generic meaning" and understood to refer to any person to whom

---

[11] Speedway does not contend that the policy or any assignment thereof provides that the proceeds would inure to the benefit of anyone other than the named beneficiaries.

another "is liable and bound to pay . . . an amount of money," whether that liability arises by contract or as a matter of law, as, for instance, for a tort. *Howard v. Long*, 142 Ga. 789, 792-793 (83 SE 852) (1914). In some contexts, however, the term is afforded "its more circumscribed and ordinary meaning as denoting the holder of an obligation arising [by contract]." Id. This ambiguity is acknowledged by Black's Law Dictionary, which explains:

> The word ["creditor"] is susceptible of latitudinous construction. In its broad sense[,] the word means one who has any legal liability upon a contract, express or implied, or in tort; in its narrow sense, the term is limited to one who holds a demand which is certain and liquidated. In statutes[,] the term has various special meanings, dependent upon context, purpose of statute, etc.

Black's Law Dictionary, p. 368 (6th ed. 1990). The context in which "creditor" appears in OCGA § 33-25-11 (a) does not clearly tell us in which sense the term is used. Accordingly, we look to other indicia of meaning.

The statute now codified at OCGA § 33-25-11 (a) was first enacted in 1960, Ga. L. 1960, p. 289, § 1 (56-2505), and it since has been amended on two occasions. See, e.g., Ga. L. 1982, p. 3, § 33; Ga. L. 2006, p. 885, § 1. The term "creditor," however, has appeared in each version of the statute, and there is no reason to think that "creditor" means something different in the current version than it meant in the earlier versions. For this reason, the history of the statute is helpful, we think, in ascertaining the meaning of "creditor," as it is used in OCGA § 33-25-11 (a).

In pertinent part, the 1960 statute was modeled after a 1933 statute, which also used the term "creditor," see Ga. L. 1933, p. 181, § 1, so we begin with the state of the law prior to the enactment of the 1933 statute. With respect to the proceeds of a life insurance policy, the Code of 1910 provided that "[t]he assured may direct the money to be paid to his personal representative, or to his widow, or to his children, or to his assignee; and upon such direction given, and assented to by the insurer, no other person can defeat the same." Civil Code of 1910, § 2498. In *Bennett v. Rosborough*, 155 Ga. 265, 272 (116 SE 788) (1923), our Supreme Court considered whether an employer might properly recover, by way of a constructive trust, the proceeds of insurance on the life of its employee, where the employee had embezzled funds from the employer and used them to pay the premiums on his life insurance. Citing the Code of 1910, the Supreme

Court concluded that the employer could not recover those proceeds:

> Where the husband takes out a policy payable to his wife and does not change the beneficiary, creditors of the husband can not in this State, in a contest with the wife, take the money, even though premiums might have been paid at a time when the husband was insolvent or with money which had been stolen from the creditors.

*Bennett*, 155 Ga. at 272. It is notable, we think, that the Supreme Court described the employer in *Bennett* as a "creditor," notwithstanding that the term "creditor" appeared nowhere in the applicable section of the Code of 1910.[12]

Ten years after *Bennett*, the General Assembly enacted a statute that carried forward the principle that a "creditor" of an insured generally cannot recover the proceeds of insurance on the life of the insured, but the 1933 statute did give a "creditor" the limited right to recover the amount of any premiums paid by the insured with intent to defraud the "creditor":

> If a policy of life . . . insurance, whether heretofore or hereafter issued, is effected by any person on his own life or on another life, in favor of a person other than himself . . . the lawful beneficiary or assignee thereof, other than the insured or the person so effecting such insurance, or his executors or administrators, shall be entitled to its proceeds and avails against the creditors and representatives of the insured and of the person effecting the same . . . ; provided, that, subject to the statute of limitations, the amount of any premiums for said insurance paid with intent to defraud creditors, with interest thereon, shall enure to their benefit from the proceeds of the policy. . . .

Ga. L. 1933, p. 181, § 1. Given the preexisting law, it seems to us likely that the 1933 statute was intended to ameliorate to some extent the harsh result of *Bennett* that, even when premiums were paid with intent to defraud a "creditor," the "creditor" could not recover anything at all from the proceeds of the life insurance. And that likelihood suggests that, when the General Assembly used the term "creditor," it meant to refer not only to voluntary creditors by contract, but also

---

[12] Deborah and the children urge that this case is controlled by *Bennett*, but *Bennett* construed a different law that did not include the term "creditor." So, although *Bennett* is instructive as historical context, it does not control the outcome in this case.

involuntary creditors, such as the employer in *Bennett* and, of course, Speedway in this case.[13]

In 1960, the General Assembly enacted a comprehensive insurance code, and in doing so, it repealed the 1933 statute, but it nevertheless carried forward the provisions of the 1933 statute about the limited extent to which a "creditor" could recover life insurance proceeds. The 1960 statute provided, in pertinent part:

> If a policy of life insurance, whether heretofore or hereafter issued, is effected by any person on his own life, or on another life, in favor of a person other than himself, . . . the lawful beneficiary or assignee thereof, other than the insured or the person so effecting such insurance or executors or administrators of such insured or the person so effecting such insurance, shall be entitled to its proceeds and avails as against the creditors and representatives of the insured and of the person effecting the same. . . . Subject to the statute of limitations, the amount of any premiums for said insurance paid with intent to defraud creditors, with interest thereon, shall inure to the benefit of creditors from the proceeds of the policy. . . .

Ga. L. 1960, pp. 289, 686-687, § 1 (56-2505). As to these provisions, the 1960 statute tracked closely the language of the 1933 statute, and we must, therefore, assume that the General Assembly meant the 1960 statute to apply to the same "creditors" as the 1933 statute. The 1960 statute was amended in 1982, Ga. L. 1982, p. 3, § 33, and again in 2006, Ga. L. 2006, p. 885, § 1, at which time the limited right of a creditor to recover the amount of premiums paid to defraud the creditor was abolished. Given this statutory history, and given our conclusion that the 1933 statute, to which the current statute traces its lineage, used "creditor" in the "generic sense," including voluntary and involuntary creditors alike, we conclude that Speedway is a "creditor," as that term is used in OCGA § 33-25-11 (a).

Speedway argues that such a construction of the statute effectively gives thieves and fraudsters an incentive to launder the

---

[13] We can think of no reason why the General Assembly would have wanted, so soon after *Bennett*, to give a limited right of recovery to voluntary creditors, but not to involuntary creditors. After all, a voluntary creditor necessarily assumes some risk that the debt will not be repaid, but an involuntary creditor has no say in the matter. And generally speaking, remedial statutes are to be construed liberally. See *Southstar Energy Svcs. v. Ellison*, 286 Ga. 709, 713 (1) (691 SE2d 203) (2010).

proceeds of their wrongdoing through life insurance, and we acknowledge that it might do just that. We do not, of course, "give an absurd construction to a statute," *Northeast Atlanta Bonding Co.*, 308 Ga. App. at 582 (2), but we cannot say that this construction of OCGA § 33-25-11 (a) is absurd. There are competing policy interests that are furthered by it, including the policy interest in providing certainty for insurers about the persons to whom proceeds of policies should be paid, as well as the policy interest in ensuring that the beneficiaries of life insurance — for some of whom the life insurance proceeds may represent the only valuable asset that the insured has left for their care — promptly receive the proceeds of the policy. It is to further these interests that the General Assembly appears to have written the current version of the statute as it did, and in light of these interests, we cannot say it absurd to construe the statute as we do. It is for the General Assembly, not appellate judges, to strike the difficult balance between competing policy interests. *Commonwealth Investment Co. v. Frye*, 219 Ga. 498, 499 (134 SE2d 39) (1963). For these reasons, the court below properly dismissed the claims that Speedway asserts as to the proceeds of the insurance on the life of Blihovde, and we affirm the dismissal of those claims.

3. In its second amended complaint, Speedway alleges that Blihovde transferred the proceeds of his fraud to Deborah and Wenona by depositing the proceeds in bank accounts in their names and by using the proceeds to purchase at least two motor vehicles, the title to which he put, at least in part, in the name of Wenona. Speedway also alleges that Blihovde made these transfers with the actual intent to hinder, defraud, or delay his creditors, that he made the transfers without receiving a reasonably equivalent value, and that he was insolvent at the time. Based on these allegations, Speedway brought claims against Deborah and Wenona, contending that the deposits and transfers of title in motor vehicles are avoidable as fraudulent transfers and that Speedway has a constructive trust and equitable lien on the funds deposited and the motor vehicles.[14] It

---

[14] In addition, Speedway asserted claims for unjust enrichment against Deborah, Wenona, and the adult children, and it also asserted claims for fraudulent transfer, constructive trust, and equitable lien against Deborah and the adult children with respect to the use of the proceeds of the fraud to pay credit card bills for their benefit. The court below dismissed these claims too, and upon our review, we see no error in the dismissal of these claims for the reasons identified by the court below in its orders of dismissal. Accordingly, we affirm the dismissal of the claims described in this footnote, and we also affirm the dismissal of any claim for attorney fees and expenses against the adult children, inasmuch as no underlying claim against them remains. See *United Companies Lending Corp. v. Peacock*, 267 Ga. 145, 147 (2) (475 SE2d 601) (1996) (a prerequisite to an award of attorney fees and expenses is the award of damages or other relief on an underlying claim).

appears to us that these allegations state viable claims against Deborah and Wenona under the Uniform Fraudulent Transfers Act. See generally OCGA §§ 18-2-74 (a) and 18-2-75 (a) (defining fraudulent transfers). And to the extent that Speedway has asserted claims for fraudulent transfers upon which relief properly might be granted, we think it also has stated claims for a constructive trust and equitable lien. See OCGA § 18-2-77 (a) (3) (C) (court may award "other relief [that] the circumstances may require" for fraudulent transfers); see also *Hood v. Smoak*, 271 Ga. 86, 87 (516 SE2d 301) (1999) (constructive trust is "implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity"); *Total Supply, Inc. v. Pridgen*, 267 Ga. App. 125, 126 (1) (598 SE2d 805) (2004) ("Where the constructive trustee has invested such funds or has purchased other property, the real owner can follow it wherever it can be traced.") (citation and punctuation omitted); *Watkins v. Watkins*, 256 Ga. 58, 59 (1) (344 SE2d 220) (1986) (an equitable lien is available as a remedy for fraud in the same circumstances as a constructive trust).

The court below, it appears, did not even consider whether deposits in the bank accounts of Deborah and Wenona might amount to fraudulent transfers.[15] And with respect to the motor vehicles, the court said that Speedway had failed to make allegations sufficient to disprove that the claim as to one vehicle was barred by the statute of limitation and sufficient to disprove that Wenona took the other in good faith. But as we said in Division 1, a plaintiff need not anticipate affirmative defenses and plead around them, and unless an affirmative defense is admitted by the plaintiff or "completely disclosed on the face of the pleadings," a motion to dismiss cannot properly be granted on the basis of an affirmative defense. See *Murrey*, 233 Ga. at 807-808. For all these reasons, we conclude that the court below erred when it dismissed the claims against Deborah and Wenona for fraudulent transfer, constructive trust, equitable lien, and declaratory judgment, to the extent those claims are based on deposits in their bank accounts and the titling of motor vehicles in their names, and we reverse the dismissal of such claims, as well as the dismissal

---

[15] In its order dismissing the claims against Deborah, the court said that "Speedway makes no assertion whatsoever that David Blihovde transferred any money or property to . . . Deborah." Speedway alleged quite clearly, however, that Blihovde "transferred misappropriated Speedway funds from an Oasis account into [an account owned by Deborah]." In its order dismissing the claims against Wenona, the court did not even mention the deposits in the account of Wenona in the course of assessing the viability of the fraudulent transfer claim against her.

of the derivative claims against Deborah and Wenona for attorney fees and expenses of litigation.

*Judgments affirmed in part and reversed in part. Barnes, P. J., and Adams, J., concur.*

DECIDED MARCH 29, 2012 —

*Smith, Welch, Webb & White, A. J. Welch, Jr., William A. White, Santana T. Flanigan*, for appellants.

*Thompson, O'Brien, Kemp & Nasuti, R. Michael Thompson, Delia C. Elder, Bret T. Thrasher, Miller & Martin, Denise A. Miller, Andersen, Tate & Carr, Thomas T. Tate, Robert M. Reeves, Meredith N. Atwood, Carlton Fields, Adam L. Hoipkemier, Eugene A. Medori, Jr., John E. Tomlinson, Eric T. Johnson*, for appellees.