**THIRD DIVISION**
**MIKELL, P. J.,**
**MILLER and BLACKWELL, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

July 13, 2012

# In the Court of Appeals of Georgia

A12A0661. RUTTER v. RUTTER.

BLACKWELL, Judge.

In this divorce case, Charles Rutter moved the court below to exclude any evidence that his wife, Stacy Rutter, might have derived from several video surveillance devices that she surreptitiously installed in their marital residence. Charles argued that her use of these devices amounts to a violation of OCGA § 16-11-62 (2), which makes it generally unlawful for one to conduct video surveillance of another in a private place, out of public view, and without his consent.[1] But at a hearing on the motion, the court below pointed to OCGA § 16-11-62 (2) (C), which

---

[1] Evidence obtained in violation of OCGA § 16-11-62 is usually not admissible in court. See OCGA § 16-11-67 ("No evidence obtained in a manner which violates any of the provisions of this part shall be admissible in any court of this state except to prove violations of this part.").

sets out an exception to the general prohibition and expressly permits one to conduct video surveillance of persons "within the curtilage of [her own] residence" for certain purposes. Relying on the exception set out in subparagraph (2) (C), the court below denied the motion to exclude, and Charles appeals from its denial.[2] We affirm the judgment below.

1. Before we consider whether the court below properly understood the exception set out in OCGA § 16-11-62 (2) (C), we must address a threshold question, namely whether subparagraph (2) (C) is still good law. Subparagraph (2) (C) came into being on April 20, 2000, when the Governor approved legislation known as House Bill 1576 ("HB 1576"), which amended OCGA § 16-11-62 and added, among other provisions, subparagraph (2) (C). Ga. L. 2000, p. 491, § 1. HB 1576 was effective on the day it was approved by the Governor. Id. at § 5. One week later, on April 27, 2000, the Governor approved legislation known as Senate Bill 316 ("SB

---

[2] The court below certified its denial of the motion for immediate review, and Charles timely filed an application with this Court for leave to take an interlocutory appeal. See OCGA § 5-6-34 (b). Because the Supreme Court has appellate jurisdiction in "[a]ll divorce and alimony cases," *Gates v. Gates*, 277 Ga. 175, 175 (1) (587 SE2d 32) (2003), we initially transferred the application to the Supreme Court, but it returned the application to us, concluding that "orders in pending divorce cases that do not involve issues of divorce or alimony do not invoke [the Supreme] Court's subject matter jurisdiction." *Rutter v. Rutter*, Case No. S11I1778 (Ga. Sep. 1, 2011). We then granted the application, and this appeal followed.

316"), which amended OCGA § 16-11-62 by "striking [that] Code [s]ection" and "inserting in its place a new Code section," one that contains no subparagraph (2) (C) and otherwise contains no provision substantially like subparagraph (2) (C). Ga. L. 2000, p. 875, § 2. The legislation known as SB 316 was effective as of July 1, 2000. Id. at § 3. We are presented, therefore, with a question about whether SB 316 effectively repealed subparagraph (2) (C), such that subparagraph (2) (C) ceased to be good law as of July 1, 2000. This question has been briefed not only by the parties, but also by the Attorney General and the Office of Legislative Counsel as *amici curiae.*[3]

A statute can be repealed expressly or by implication, see *Boynton v. Lenox Square, Inc.*, 232 Ga. 456, 461 (II) (207 SE2d 446) (1974), but we find no language in SB 316 that expressly and specifically repeals either HB 1576 or subparagraph (2) (C). Accordingly, we turn to consider whether SB 316 repealed subparagraph (2) (C) by implication.[4] Repeals by implication are disfavored, and "it is only when a statute

---

[3] The briefs of *amici curiae* have been especially helpful to the Court, and we thank the Attorney General and Legislative Counsel for their assistance in this case.

[4] Legislative Counsel invites us to avoid altogether the question of repeal and to hold instead that the publication of subparagraph (2) (C) in the Official Code is dispositive of its validity, inasmuch as the Code Revision Commission has approved of its publication, see OCGA § 28-9-1 et seq., and the General Assembly annually has

and a previous statute are clearly repugnant that a repeal by implication will result."

*Concerned Citizens of Willacoochee v. City of Willacoochee*, 285 Ga. 625, 625 (680 SE2d 846) (2009). Moreover, statutes touching upon the same subject generally are construed together, and that rule applies with "peculiar force," our Supreme Court has said, when the statutes were enacted at the same session of the General Assembly. *Inter-City Coach Lines v. Harrison*, 172 Ga. 390, 395 (3) (157 SE 673) (1931) ("The rule that statutes in pari materia should be construed together applies with peculiar force to statutes passed at the same session of the legislature; it is presumed that such acts are imbued with the same spirit and actuated by the same policy, and they are to be construed together as parts of the same act.") (citation and punctuation omitted). Consequently, to the extent that the words of the statutes permit, courts should

---

the opportunity to disapprove the work of the Commission. We respectfully decline that invitation. In the first place, it has long been settled in this country that it is the responsibility of the courts to ascertain the law. See generally *Marbury v. Madison*, 5 U. S. (1 Cranch) 137, 177 (2 LE 60) (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Consistent with that principle, our Supreme Court has undertaken to consider whether a provision of the Official Code had been repealed, and in doing so, it did not say anything about deferring to the fact of publication in the Official Code. See, e.g., *Gilbert v. Richardson*, 264 Ga. 744, 749 (4) n.6 (452 SE2d 476) (1994). Moreover, as the Attorney General explains in his *amicus* brief, the position of Legislative Counsel on this point raises serious constitutional concerns, including concerns about the delegation of the legislative power.

4

construe statutes passed at the same legislative session "so as to make both valid and binding, and to give effect to all the words of both, so as to make them capable of enforcement." Id.

There are two ways in which SB 316 potentially might work a repeal of subparagraph (2) (C) by implication. First, to the extent that the substantive provisions of SB 316—meaning the substantive provisions of the "new" OCGA § 16-11-62 enacted by SB 316—conflict with the substance of subparagraph (2) (C), such a conflict might amount to a repeal by implication. Second, to the extent that the enacting provision of SB 316—meaning the legislative directive "striking Code Section 16-11-62 . . . and inserting in its place a new Code section"—conflicts with the very existence of subparagraph (2) (C), that conflict too might amount to a repeal by implication. Having reviewed carefully the language of SB 316, as well as the legislative history[5] of both HB 1576 and SB 316, we conclude that SB 316 works no repeal by implication of subparagraph (2) (C).

---

[5] The legislative history on which we rely is not the kind that consists of subjective statements of legislative intent, judicial reliance upon which has sometimes been questioned. See *Merritt v. State*, 286 Ga. 650, 656-657 (690 SE2d 835) (2010) (Nahmias, J., concurring specially). Rather, we look to a more objective sort of legislative history, the legislative votes upon, and amendments of, the bills that ultimately were passed and approved as the statutes in question.

About the substantive provisions of SB 316, we cannot say that they clearly are repugnant to subparagraph (2) (C). Although the version of OCGA § 16-11-62 enacted by SB 316 contains no provision substantially like subparagraph (2) (C), it also contains no provision inconsistent with subparagraph (2) (C). Indeed, that version of OCGA § 16-11-62 can be combined with subparagraph (2) (C) without contradicting any substantive provision of the Code section adopted in SB 316, and the exception set out in subparagraph (2) (C) is applicable to circumstances other than those addressed by the exceptions to OCGA § 16-11-62 (2) that are set out in SB 316.[6] Accordingly, we conclude that the substantive provisions of SB 316 did not repeal subparagraph (2) (C) by implication.

The enacting provision of SB 316 presents a more difficult issue. After all, subparagraph (2) (C) had been made a part of OCGA § 16-11-62 by the time SB 316 became effective, Ga. L. 2000, p. 491, § 5, and SB 316 contains an express directive

---

[6] SB 316 sets out two exceptions to OCGA § 16-11-62 (2), subparagraphs (2) (A) and (2) (B). Ga. L. 2000, p. 875, § 2. Subparagraph (2) (A) concerns video or photographic surveillance of persons in correctional facilities, and subparagraph (2) (B) concerns video or photographic surveillance by the owner of any real property (not just residential property) to observe or record activities "in areas where there is no reasonable expectation of privacy" for certain purposes. Subparagraph (2) (C), on the other hand, concerns video or photographic surveillance by a resident upon residential property to observe or record activities "within the curtilage" of the residence for certain purposes.

6

"striking Code Section 16-11-62 . . . and inserting in its place a new Code section,"
one that contains no subparagraph (2) (C).[7] Ga. L. 2000, p. 875, § 2. When we
consider the meaning of a statute, "we always must presume that the General
Assembly means what it says and says what it means." *Northeast Atlanta Bonding
Co. v. State*, 308 Ga. App. 573, 577 (1) (707 SE2d 921) (2011). To this end, our
search for the meaning of a statute "must begin with the words of the statute, and if
those words are clear and unambiguous, the search also must end there." Id. at 577-
578 (1). But when the words of the statute are reasonably susceptible of more than

---

[7] Although one might think that statutory language "striking Code Section 16-11-62" could reasonably be understood as "repealing Code Section 16-11-62," the typical usage of such language in Georgia statutes during the 2000 legislative session indicates that it should not necessarily be so understood. As the Attorney General notes in his *amicus* brief, at that time, the General Assembly routinely used the "striking . . . and inserting in its place" language, or substantially similar language, whenever it revised an existing Code section. See, e.g., Ga. L. 2000, p. 1, § 1 ("striking . . . and inserting in lieu thereof"); Ga. L. 2000, p. 2, §§ 3-14 (same); Ga. L. 2000, p. 15, § 1 ("striking . . . and inserting in its place"); Ga. L. 2000, p. 16, § 1 ("striking . . . and inserting in lieu thereof"); Ga. L. 2000, p. 20, §§ 1-28 (same). As such, we do not understand the "striking . . . and inserting in its place" formulation to necessarily signal a repeal of everything contained in "Code Section 16-11-62," but we understand it instead to signal that "Code Section 16-11-62" is revised to read as set out in the "new Code section" that follows. Nevertheless, to the extent that a provision contained in "Code Section 16-11-62" was omitted from the "new Code section," "striking . . . and inserting in its place" might reasonably be understood to impliedly repeal the omitted provision, so it becomes important to consider exactly what was meant by the General Assembly when it referred in SB 316 to "Code Section 16-11-62."

one meaning, we properly may look beyond the statutory language itself to other indicia of meaning. See *Speedway Motorsports, Inc. v. Pinnacle Bank*, ___ Ga. App. ___ (2) (Case No. A11A2350, decided Mar. 29, 2012).

Here, it is perfectly clear that SB 316 was intended to strike "Code Section 16-11-62," and at first glance, such a specific reference to a particular Code section seems clear and unambiguous. But when we consider the unusual circumstance of OCGA § 16-11-62 having been amended only a week before SB 316 was approved by the Governor, the identity of the statutory provisions intended to be struck by SB 316 seems less clear. After all, SB 316 was passed by the General Assembly on March 15, 2000, JOURNAL OF THE SENATE OF THE STATE OF GEORGIA, 2000, p. 1411, more than a month before the Governor approved HB 1576, adding subparagraph (2) (C) to OCGA § 16-11-62. So, between the time the General Assembly passed SB 316 and the time it became effective, OCGA § 16-11-62 changed.

To which version of OCGA § 16-11-62 does SB 316 refer when it mentions "Code Section 16-11-62"? The most reasonable answer, it seems to us, is the version of OCGA § 16-11-62 that was in effect as of the date the General Assembly passed SB 316. In the first place, to answer otherwise would be to permit subsequent

8

developments to alter the meaning of the statute.[8] Second, to answer otherwise would contradict the usual rule that statutes touching upon the same subject and passed in the same legislative session should be reconciled, if possible.[9] And finally, to answer otherwise would be to ignore the legislative history of HB 1576 and SB 316. Indeed, the legislative record shows that the Senate passed the final version of SB 316 on March 15, 2000, JOURNAL OF THE SENATE OF THE STATE OF GEORGIA, 2000, p. 1411, and it also reveals that, the very next day, the Senate amended HB 1576 to *add* the provision that eventually became subparagraph (2) (C).[10] JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE STATE OF GEORGIA, 2000, p. 2881. We cannot ascertain

---

[8] That would, of course, be inconsistent with the constitutional commitment of the legislative power to the General Assembly, Ga. Const., art. III, sec. 1, para. 1, as well as the settled notion that statutes have fixed meanings. See Scalia & Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, p. 78 (1st ed. 2012).

[9] As the leading commentary on statutory interpretation notes, this rule has particular importance when the statutes amend the same body of preexisting law and "may be introduced in each of the two houses of the legislature independently of each other, and passed within a few days of each other, and for which the order of introduction is only accidental." Singer & Singer, 1A SUTHERLAND ON STATUTORY CONSTRUCTION, § 22:32 (7th ed. 2009).

[10] HB 1576 then returned to the House, which modified the language of the Senate amendment adding subparagraph (2) (C), JOURNAL OF THE HOUSE OF REPRESENTATIVES OF THE STATE OF GEORGIA, 2000, p. 2972, and the Senate approved these modifications and passed the final version of HB 1576 on March 22, id., p. 3882, exactly one week after it approved SB 316.

9

any reason for the Senate having so amended HB 1576 if it intended that subparagraph (2) (C) would be struck by another statute that the Senate had passed only one day earlier. For all these reasons, the most reasonable interpretation of the reference in SB 316 to "Code Section 16-11-62," we think, is that it refers to the version of OCGA § 16-11-62 that was effective as of March 15, 2000, the date that the General Assembly passed SB 316.[11] Consequently, subparagraph (2) (C) survived the enactment of SB 316 and remains good law.

2. We next consider whether the court below properly applied subparagraph (2) (C) when it denied the motion to exclude. As an exception to the general prohibition of certain video surveillance set out in OCGA § 16-11-62 (2), subparagraph (2) (C) provides that it is lawful "[t]o use for security purposes, crime prevention, or crime detection any device to observe, photograph, or record that activities of persons who are within the curtilage of the residence of the person using such device." OCGA § 16-11-62 (2) (C). Charles contends that this exception does not apply in this case for several reasons. First, he says, it does not apply because surveillance of persons

---

[11] We do not mean to suggest that the order in which the Governor approves several legislative acts is inconsequential. We only find that, in the circumstances presented here, the order in which the Governor approved HB 1576 and SB 316 does not alter the meaning of the express terms of SB 316 and does not work a repeal of subparagraph (2) (C), either expressly or by implication.

10

within a residence itself is not surveillance "of persons who are within the curtilage of the residence." Second, he argues, Stacy was not a resident of the marital residence at the time she installed and used the video surveillance devices, and the court below erred when it found otherwise. Third, he says, Stacy did not use the video surveillance devices in question for a permissible purpose, namely security, crime prevention, or crime detection. We will address these contentions in turn.

(a) As to the contention that the residence itself is not "within the curtilage of the residence," we disagree. Charles contends that a residence and its curtilage are separate and distinct, such that the residence itself is not, strictly speaking, a part of its curtilage. See, e.g., *United States v. Dunn*, 480 U. S. 294, 300 (II) (107 SC 1134, 94 LE2d 326) (1987) ("curtilage" usually refers to "the area immediately surrounding a dwelling house"); *Thomas v. State*, 300 Ga. App. 265, 268 (3) (684 SE2d 391) (2009) ("'Curtilage' has been defined as the yards and grounds of a particular address, its gardens, barns, and buildings.") (citation and punctuation omitted).[12] But

_____

[12] As this Court explained nearly a century ago, the term "curtilage" originally was understood at common law to refer to those structures and areas within the fence or wall that usually surrounded dwelling houses in England. *Wright v. State*, 12 Ga. App. 514, 515-516 (77 SE 657) (1913). But in the United States, where dwelling houses are not always so neatly enclosed by a fence or wall, the term is now understood to include any structures and areas upon residential property that are so near and so closely connected to the dwelling house as to be considered a part of it,

11

the statutory exemption in subparagraph (2) (C) does not extend merely to surveillance of "the curtilage," but rather, it extends to surveillance "within the curtilage." So, even if the word "curtilage" unambiguously excludes the residence itself, it is not so clear that "within the curtilage" excludes the residence. After all, when English-speaking people say that one thing is "within" another, they sometimes mean that the first thing is a part of the second, and they sometimes mean that the first thing is enclosed by the second.[13] In which sense is "within" used in subparagraph (2) (C)? The answer does not appear clearly from the words of the statute alone,[14] so we must look elsewhere.

---

whether or not enclosed with the dwelling house by a fence or wall. Id. at 516-517.

[13] For instance, it would be fair to say that the core of the Earth is not within the crust, if you mean to say that the core is not a part of the crust. But it also would be fair to say that the core is within the crust, if you mean to say that it is completely enclosed by the crust. It all depends on the sense in which the word "within" is used.

[14] Some of us are inclined to think that "within the curtilage" is most naturally understood to include the residence to which the curtilage is attached, especially since the traditional American understanding of "curtilage" is as a reference to those structures and areas so closely connected to the residence as to be considered a part of it. See note 12 *supra.* Nevertheless, we admit some doubt about this inclination, and so we do not rest our conclusion upon the plain words of the statute alone. We accept that some ambiguity exists, and we proceed upon that premise.

The parties point us to no extrinsic indicia of legislative intent that bear upon this question, they point us to none of the usual canons of statutory construction that might apply, and we have found none. We turn, therefore, to the rule of lenity, an interpretative rule of last resort for the construction of penal statutes. See *Harris v. State*, 286 Ga. 245, 253 (7) (686 SE2d 777) (2009). Subparagraph (2) (C) sets forth an exemption to the general prohibition contained in OCGA § 16-11-62 (2), and the latter is a penal statute, a violation being punishable as a felony. OCGA § 16-11-69. As such, the rule of lenity is a proper aid, we think, in the resolution of any ambiguity appearing in subparagraph (2) (C).[15] And according to the rule of lenity, when the usual rules of statutory construction fail to resolve an ambiguity in a penal statute, a court must attribute to the ambiguous statutory language the reasonable meaning that exposes the least conduct to criminal sanctions. See *Haley v. State*, 289 Ga. 515, 527 (2) (b) (712 SE2d 838) (2011) ("To the extent that these tools of statutory construction leave doubt about the meaning of the statute, moreover, the rule of lenity would require us to interpret it in favor of the defendant."); *Harris*, 286 Ga. at 253 (7) ("[T]o the extent that, after applying the usual tools of statutory construction, it is

[15] The rule of lenity applies to the construction of penal statutes, even when they are construed in the context of a civil lawsuit. See *Fleet Finance, Inc. of Ga. v. Jones*, 263 Ga. 228, 231 (3) (430 SE2d 352) (1993).

13

uncertain or ambiguous whether OCGA § 16-8-12 (a) (5) (A) applies to a riding lawnmower, the rule of lenity would require us to give the benefit of that doubt to the accused."); *Fleet Finance*, 263 Ga. at 231 (3) (penal statute "must be construed strictly against criminal liability and, if it is susceptible to more than one reasonable interpretation, the interpretation most favorable to the party facing criminal liability must be adopted"). Accordingly, we conclude that "within the curtilage of the residence," as that phrase is used in OCGA § 16-11-62 (2) (C), includes the residence itself.

(b) About the contention that the court below erred when it found that Stacy was a resident of the marital residence when she installed and used the video surveillance devices, we disagree. Stacy was not a resident of the marital residence at that time, Charles says, because she did not sleep there and had given another address as her residential address to some third parties. But the evidence shows that, notwithstanding these things, she continued, during the time that she used the video surveillance devices, to keep clothes and other personal items at the marital residence, she paid a portion of the mortgage for that residence, she received some mail at that residence, and she spent some portion of every other day at the residence, doing things like cooking, eating, bathing, and washing clothes. The law recognizes that a

person can have more than one residence, see *Baghdady v. Central Life Ins. Co.* 224 Ga. App. 170, 170-171 (1) (a) (480 SE2d 221) (1996), and this Court has recognized that a person can maintain a residence by keeping personal items there, paying bills relating to the home, receiving mail at its address, and returning to the home frequently, even though she does not usually stay overnight at the home. See, e.g., *State Farm Fire & Cas. Co. v. Goodman*, 259 Ga. App. 62, 66 (3) (a) (576 SE2d 49) (2002). Although the evidence of residence in this case was disputed, we cannot say that the court below clearly erred when it found that Stacy was a resident of the marital home during the relevant times.

(c) About the contention that Stacy did not use the video surveillance devices for a permissible purpose, we again disagree. Subparagraph (2) (C) identifies three such purposes, namely security, crime prevention, and crime detection. The court below found that Stacy did not use the video surveillance devices for security purposes, inasmuch as she did not usually monitor a live video feed from the devices so as to detect criminal activity in progress, but instead viewed recordings of the video surveillance well after the events depicted in the recordings were complete. The court also found that Stacy did not use the devices for crime prevention, inasmuch as they were installed surreptitiously and, therefore, would not deter any criminal

15

conduct. Instead, the court found that Stacy primarily was motivated by a desire to capture evidence of Charles doing things that would help her to obtain custody of the children in the divorce proceedings. Nevertheless, the court concluded that subparagraph (2) (C) applied, and it did so after clearly acknowledging that subparagraph (2) (C) requires that video surveillance be undertaken for one of the permissible purposes identified in the statute. For this reason, although the court below did not say so explicitly, we understand it to have found that Stacy used the video surveillance devices for the purpose of crime detection, insofar as video evidence of Charles committing a crime, especially if the crime were committed against or in the presence of their children, obviously would help her to gain custody in the divorce. Indeed, the record supports such a finding, Stacy having testified at the hearing on the motion to exclude that she installed and used the video surveillance devices in an effort to discover and document any harm that Charles might visit upon

the children.[16] Consequently, we cannot say that the court below erred when it concluded that subparagraph (2) (C) applies in this case.

For these reasons, we affirm the judgment below.[17]

*Judgment affirmed. Mikell, P.J., and Miller, J., concur.*

---

[16] This case comes to us on an interlocutory appeal from a pretrial evidentiary ruling, and the evidentiary record has not yet been fully developed. The reader should know that, although Stacy has alleged that Charles abused her and that she worries about Charles abusing their children, the record contains no finding that he has done any such thing. Whether or not he has, in fact, abused anyone is a question not presented in this appeal.

[17] Charles also contends on appeal that Stacy failed to preserve, or at least has failed to produce, all of the video recordings made in their marital home. But as far as we can tell, the motion to exclude was not premised on any theory of spoliation, and the court below did not rule on any such theory. Accordingly, we offer no opinion about whether video recordings offered at trial by Stacy might properly be excluded on grounds of spoliation.