41181. TANNER et al. v. BRASHER et al.

(326 SE2d 218)

SMITH, Justice.

Appellees, Bill Brasher and Norman Kittles, filed suit as representatives of a class of Sapelo Island landowners to enjoin certain state officials from interfering with their access to property that they claimed on the northern end of the island. They also sought damages from the officials. Appellants, the officials, filed a motion to dismiss, which the trial court treated as a motion for summary judgment. They subsequently appealed from the denial of the motion and the trial court's certification of the class. We affirm in part and reverse in part.

In 1969, Annemarie Reynolds sold her holdings on Sapelo to the state. She conveyed most of the property by warranty deed. She conveyed some of the property, including the area known as Racoon Bluff, by quitclaim deed on the advice of her attorney. Mrs. Reynolds apparently intended to quitclaim her interest in lots in Racoon Bluff that the Reynolds estate had purchased from the owners, descendants of a group of former slaves who had settled in Racoon Bluff after manumission.

In 1983, Brasher, who is a real estate developer, and Kittles purchased a lot in Racoon Bluff from the Handy family. The evidence does not show that the Reynolds estate ever purchased this lot. Brasher and Kittles subsequently attempted to ferry a jeep to Sapelo so they could drive to the lot. State officials met them at the public landing on Sapelo and would not allow them to land.

Brasher and Kittles filed a claim to the lot with the Department of Natural Resources and later filed this suit. Appellants contend that the state gained title to the lot and to all of Racoon Bluff by adverse possession under color of the quitclaim deed. Brasher, Kittles, and the prospective class members assert that they never relinquished their claims to the land and that the state's possession of the land was

permissive at best.

Some of the potential class members testified that although no one lived at Racoon Bluff, their families had owned land there for many years, they had paid taxes on the land, and they visited the land occasionally. They asserted that the state never notified them of its claim to the land. They also testified that the state closed the gate to the north end of Sapelo during hunts and during timber cutting, and that the state required them to ask permission before they could go to the north end to collect wood or to hunt racoons. No permission was required to go fishing at the north end.

The trial court ruled that appellees created an issue of fact as to the ownership of Racoon Bluff and therefore as to whether the officials were acting within the scope of their employment in denying appellees access to the property. The court also certified the landowners as a "common" class. The court denied appellees' motion for an interlocutory injunction, but appellees did not appeal the ruling.

1. Appellants, the state officials, assert the defense of sovereign immunity on two levels. Appellants contend that they should be granted summary judgment because they all acted within the scope of their authority, thus this suit is actually against the state and should be barred by sovereign immunity. Appellants claim that they acted within the scope of their authority because the state, not appellees, owned the land in question. They contend that appellees are precluded by sovereign immunity from questioning the state's claim to adverse possession of the land.

We begin with appellants' assertion that appellees may not question the state's claim to the land. The concepts behind the state and federal mandates of sovereign immunity are so similar that we may turn to cases based upon the Eleventh Amendment to the United States Constitution for guidance.[1] *United States v. Lee,* 106 U. S. 196 (1 SC 240, 27 LE 171) (1882), provides a situation in which the United States Supreme Court was faced with a strikingly similar fact situation.[2]

Under the will of George Washington Parke Custis, his Arlington, Virginia estate passed to his daughter, the wife of General Robert E. Lee, for life, then to his grandson, George Washington Parke Custis Lee. During the Civil War, the United States Congress passed legislation "for the collection of direct taxes in the insurrectionary dis-

---

[1] See *Harper v. DeFreitas,* 117 Ga. App. 236 (160 SE2d 260) (1968); *Ramsey v. Hamilton,* 181 Ga. 365, 372-73 (182 SE 392) (1935).

[2] Note that *Lee,* while it has been limited, is still binding federal authority for this claim in this fact situation. *Malone v. Bowdoin,* 369 U. S. 643, 648 (82 SC 980, 8 LE2d 168) (1962). See also *Fla. Dept. of State v. Treasure Salvors, Inc.,* 458 U. S. 670 (102 SC 3304, 73 LE2d 1057) (1982).

tricts," which divested an owner's title to land if the owner did not pay the tax on the land in person. *Lee,* supra at 199. Mrs. Lee, who owned the life estate at the time that the legislation was passed, did not, for obvious reasons, travel to Washington to pay the tax. The federal government rejected an offer by Mrs. Lee's agent to pay the tax and subsequently purchased the property at a tax sale.

George W. P. C. Lee, a few years later, inherited the property and filed suit against a number of federal officials to prevent them from interfering with his rights in the estate. The defendants, and the United States on appeal, contended that the property, which was being used as a cemetery for soldiers and sailors and was known as "Arlington Cemetery," belonged to the United States. They claimed that this showed the suit to be one against the government and thus barred by sovereign immunity. The Supreme Court identified the threshold issue: "Could any action be maintained against the defendants for the possession of the land in controversy under the circumstances of the relation of that possession to the United States, however clear the legal right to that possession might be in the plaintiff?" *Lee,* supra at 199.

The court, after analyzing the differences between the British and American concepts of sovereign immunity, cited *United States v. Peters,* 5 Cranch. 115 (3 LE 53) (1809), in which Chief Justice Marshall stated, "[I]t certainly can never be alleged that a mere suggestion of title in a State . . . must arrest the proceedings of the court, and prevent their looking into the suggestion and examining the validity of the title." *Lee,* supra at 210. The court then denied the government's assertion that a court may not inquire into a suit against an individual "in regard to property which he holds as an officer or agent of the United States," *Lee,* supra at 216.

In this case, as in *Lee,* the scope of the employees' authority will depend, to a degree, upon the validity of the employees' assertion of title in the state. In this situation we must reject, as the *Lee* court did, "the argument . . . that the formal suggestion of the existence of such authority forbids any inquiry into the truth of the suggestion." *Lee,* supra at 219.[3] Sovereign immunity does not enable state officials to prove the state's ownership of land simply by saying that the state owns the land.

To hold otherwise would throw the constitutional doctrine of sovereign immunity in conflict with the constitutional provision for separation of powers. 1983 Const. of Ga., Art. I, Sec. II, Par. III. This

---

[3] We emphasize that the employees of the state, here, claim that the state has acquired the land by adverse possession. This case is clearly distinguishable from cases such as *Linder v. Ponder,* 209 Ga. 746 (75 SE2d 814) (1953) in which the state held record title and the evidence showed state ownership as a matter of law.

court held in *Dougherty v. Bethune*, 7 Ga. 90, 92 (1849), "Whether facts upon which rights depend, are true or false, is an inquiry for the Courts to make, under legal forms; it belongs to the judicial department of the Government. By the Constitution the legislative, [executive,] and judicial departments are distinct." As the legislature was denied the power to legislate the truth of facts in *Dougherty*, here we must deny the executive branch the power to conclusively establish facts by pleading them.

We thus turn to appellants' claim that they have established, as a matter of law, the state's acquisition of the property involved here by adverse possession. Appellees produced evidence that they have record title to the land, that the state's possession of the land was permissive, and that the state did not purport to have a valid claim of right to the land or give notice that it did have a valid claim to the land. This evidence is sufficient to raise questions of fact as to whether the state acquired the land by adverse possession. OCGA §§ 9-11-56, 44-5-161.

As the validity of appellants' claim of state ownership of the land in question has not been established as a matter of law, the scope of appellants' authority may not yet be determined. We hold that appellants' second tier sovereign immunity claim, based upon their claim that they all acted within the scope of their authority, does not at this time bar appellees' case as a matter of law. We thus return this case to the trial court for a determination of the validity of appellants' assertion that the state owns the disputed land, the scope of appellants' authority, and the parties' rights and liabilities involved in and stemming from the events leading up to this case.

2. We now turn to appellants' claim that the trial court erred in certifying this action as a class action under *Ga. Investment Co. v. Norman*, 229 Ga. 160 (190 SE2d 48) (1972), and OCGA § 9-11-23.

Appellees assert that this action is a common class action of the type spawned by *Norman*. While the nature of the *Norman* action in Georgia is far from clear,[4] we may safely hold that this case does not fit the requirements for certification under any of the various interpretations of *Norman*. For this reason, we do not feel that this is a

---

[4] Justice Hall, dissenting in *Herring v. Ferrell*, 233 Ga. 1, 6 (209 SE2d 599) (1974), interpreted the *Norman* action as a "spurious" action based upon the 1938 Federal Rules of Civil Procedure. A number of other cases, following *Sta-Power Indus. v. Avant*, 134 Ga. App. 952 (216 SE2d 897) (1975), have relied upon federal precedent based upon Federal Rule 23 (b) (3) in spite of Justice Nichols' disclaimer of federal precedent in *Norman*. See *Hill v. General Finance Corp.*, 144 Ga. App. 434 (241 SE2d 282) (1977). *Sta-Power* itself, while expressly relying upon (b) (3) cases, clouded the issue by discussing a possible requirement that class members intervene in class suits in contravention of the opt-out procedure provided in (b) (3) cases. Justice Nichols himself based the *Norman* action on language found in OCGA § 9-11-23 (a) (1).

proper case in which to define the *Norman* action with any more clarity than it has aleady been defined.

Appellees' complaint alleges that state officials have interfered with access to the north end of Sapelo. The alleged class consists of persons who own land at Racoon Bluff. To succeed, class members must disprove the validity of appellants' claim that they were justified in restricting access to the north end because, among other reasons, the state has acquired appellees' land by adverse possession.

Three issues central to the determination of liability in this case will require the court to delve into individual questions: 1) the extent of appellants' interference with the access of each plaintiff to Racoon Bluff; 2) the validity of the claim of right and chain of title for each alleged class member; and 3) the nature of the state's possession relative to each class member. Where the resolution of individual questions plays such an integral part in the determination of liability, a class action suit is inappropriate.[5] See *Williams v. Cox Enterprises*, 159 Ga. App. 333 (283 SE2d 367) (1981). We thus hold that the trial court erred in certifying this action as a class action.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED FEBRUARY 27, 1985.

*Michael J. Bowers, Attorney General, Gilbert, Gilbert, Whittle, Harrell, Gayner & Scarlett, Wallace E. Harrell, Special Assistant Attorney General,* for appellants.
*Daniel H. White,* for appellees.

---

[5] This is not a case in which damages alone present the individual questions. The case, thus, will not require the court to decide whether it will follow federal precedent based upon Federal Rules 23 (c) (4) and (b) (3) and split issues in certifying class actions (see *Eisen v. Carlisle & Jacquelin*, 417 U. S. 156, 179 (94 SC 2140, 40 LE2d 732) (1974) (Douglas, J., concurring in part and dissenting in part)), or hold Federal Rule 23 (b) (3) cases inapplicable to the *Norman* action.