A08A1044. RENTRITE, INC. v. SENTRY SELECT
INSURANCE COMPANY.
(667 SE2d 888)

MILLER, Judge.

Rentrite, Inc. sought coverage under a Commercial Marine Inland insurance policy (the "Policy") issued to it by Sentry Select Insurance Company ("Sentry") for the loss of three pieces of rental equipment used in its business. After Sentry denied coverage, Rentrite initiated the current action, asserting claims for breach of contract and bad faith. The trial court granted summary judgment in favor of Sentry, holding as a matter of law that the insurance policy

---

at issue did not provide coverage for the losses sustained by Rentrite. Rentrite now appeals, asserting that the trial court's order was erroneous because it was based, in part, on non-existent policy language. We agree and find that the trial court erred in granting summary judgment against Rentrite as to two of its three claims under the insurance policy. We therefore affirm in part and reverse in part.

"On appeal from a grant of summary judgment, we conduct a de novo review of the evidence to determine if there exists a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, entitle the movant to judgment as a matter of law." (Citation omitted.) *Wachovia Bank v. Moody Bible Institute of Chicago*, 283 Ga. App. 488, 489 (642 SE2d 118) (2007). The construction of an insurance contract, including the issue of whether a contract is ambiguous, is a question of law for the court. *Collier v. State Farm &c. Ins. Co.*, 249 Ga. App. 865, 866 (2) (549 SE2d 810) (2001).

So viewed, the record shows that Rentrite is a Georgia corporation that rents and sells heavy, earth-moving equipment, primarily to grading contractors. In February 2002, Rentrite agreed to rent an excavator to a first-time customer, John Pettiford, d/b/a All Seasons Contracting, who was located near Tifton. Pettiford negotiated the rental with Ted Flanagan, Rentrite's vice president. The men agreed that Rentrite would have the excavator delivered to Pettiford and that Pettiford would pay $2,300 to cover the first week's rental and the round trip cost of transporting the machine to and from Tifton. When it shipped the excavator, Rentrite gave the driver a rental agreement for Pettiford to sign and instructed the driver not to leave the equipment unless Pettiford provided him with a check. After delivering the excavator, the driver returned both the executed rental agreement and a check for $2,300 to Rentrite. Although Rentrite had faxed Pettiford a credit application, he never returned the same.

Pettiford's February 18, 2002 check was returned for insufficient funds. Flanagan then asked George Savage, a private investigator, to run a background check on Pettiford. Among other things, Savage obtained Pettiford's driver's license number.

On February 26, 2002, Flanagan contacted Pettiford, who explained that the check had reached his bank before he had deposited the funds, a situation that Flanagan testified was not uncommon in the construction and grading business. Pettiford further stated that he also needed to rent a bulldozer and asked Flanagan if Rentrite would deliver one, provided Pettiford wired them money to cover the $2,300 check and funds to cover the transportation and first week's rental of the bulldozer. Flanagan agreed and Pettiford wired Rentrite

$5,000. Rentrite delivered a bulldozer to Pettiford on March 2, 2002, and Pettiford signed a rental agreement for that piece of equipment.

Following the delivery of the bulldozer, Pettiford sent Rentrite a check in the amount of $8,564 to cover rental costs on both the excavator and the bulldozer. That check was also returned for insufficient funds. Flanagan then made repeated attempts to contact Pettiford to obtain additional payments and to have the equipment returned to Rentrite. In response, Flanagan sent another check for $5,000, dated March 25, 2002, which also bounced.

Shortly after receiving the third bad check from Pettiford, Flanagan left the country for vacation. While Flanagan was gone, Pettiford contacted Rentrite and asked to rent a third piece of equipment, a backhoe. Knowing that he was a current customer, and unaware of the problems with his account, Rentrite employees had a backhoe delivered to Pettiford in Tifton on April 3, 2002. In exchange for the backhoe, Pettiford gave Rentrite a $5,000 check, which was returned for insufficient funds.

When he returned from vacation, Flanagan made repeated efforts to recover all of Rentrite's equipment from Pettiford, even traveling to Tifton in an attempt to do so. Flanagan was unsuccessful, and it was eventually discovered that Pettiford was part of a professional ring which engaged in the criminal conversion of leased construction equipment. At the time of Flanagan's deposition in September 2003, Pettiford was in jail in Georgia and there were reportedly arrest warrants out on him in three additional states.

Rentrite sought to recover under the Policy for its losses resulting from Pettiford's conversion of its equipment. Sentry denied Rentrite's claims and this litigation followed.

1. We first address Rentrite's breach of contract claims. Rentrite sought to recover under that part of the Policy that provides coverage for a "false pretense loss." The Policy defines such a loss, in relevant part, as "loss to covered property resulting from . . . [c]riminal conversion of covered property by your customer." Under Georgia law, Pettiford's conduct constituted the criminal conversion of Rentrite's property. OCGA § 16-8-4.[1] Accordingly, the losses sustained by Rentrite as a result of that conduct fall within the Policy's

---

[1] That statute provides, in relevant part:
A person commits the offense of theft by conversion when, having lawfully obtained [the] property of another including . . . leased or rented personal property, under an agreement or other known legal obligation to make a . . . specified disposition of such property, he knowingly converts the . . . property to his own use in violation of the agreement or legal obligation.
OCGA § 16-8-4 (a).

coverage. See *Western Heritage Ins. Co. v. Newcastle Auto Sales*, 249 Ga. App. 262, 263 (547 SE2d 792) (2001) (false pretense loss, as opposed to theft, occurs where insured voluntarily surrenders money or property); *Canal Ins. Co. v. Wilkes Supply Co.*, 203 Ga. App. 35, 37 (2) (416 SE2d 105) (1992) (contrasting a false pretense loss with a loss by theft).

Sentry, however, asserts that these claims are excluded from the Policy by Policy provision B. 2. i., which bars coverage for any false pretense loss:

> (1) [Occurring] [a]fter the first installment payment has been made;
>
> (2) Due solely to an insufficient funds check;
>
> (3) Due to incorrect information on a credit application or rental or lease agreement other than false or forged name, social security number, or signature;
>
> (4) As the result of [the insured's] contractual obligation to become liable in the event of default by the purchaser or lessee;
>
> (5) Due to non-payment, for any reason, of any credit [an insured] extend[s];
>
> (6) Due to bankruptcy;
>
> (7) If [the insured] fail[s] to obtain, prior to the transaction [resulting in the loss], the other party's business address, phone number, and driver's license number.

The trial court agreed and, citing the foregoing language, granted summary judgment in favor of Sentry, concluding:

> In this case, the record shows that on three different occasions, *Ted Flanagan failed to obtain a copy of Mr. Pettiford's driver's license, driver's license number or credit application as required by the Commercial Inland Marine Coverage Contract.* The Court finds that Mr. Flanagan failed to comply with the clear and unambiguous terms of the contract and thus summary judgment [in favor of Sentry] regarding the issue of breach of contract is GRANTED.

(Emphasis supplied.)

This conclusion misstates the relevant Policy language while reading into the Policy words that cannot be found there. The Policy does not require an insured to obtain either a copy of a customer's

driver's license or a credit application from the customer. Rather, the exclusionary language relied on by both the trial court and Sentry merely states that the Policy will not cover a false pretense loss where the insured fails to obtain the customer's business address, phone number, and driver's license number. Additionally, while the Policy will not cover a false pretense loss resulting from "incorrect information on a credit application or rental or lease agreement," there is no requirement that an insured obtain a credit application from all of its customers. In short, the foregoing exclusionary language does not impose the coverage requirements found by the trial court and we cannot create such requirements through interpretation. Where the terms of an insurance policy are plain and unambiguous, courts may not reduce or extend policy coverage by inference — i.e., by reading into the contract language that cannot be found therein. See *Lambert v. Alfa Gen. Ins. Corp.*, 291 Ga. App. 57, 58 (660 SE2d 889) (2008); *Collier*, supra, 249 Ga. App. at 868 (3). Moreover, exclusions in an insurance .policy are to be interpreted narrowly, in favor of the insured, "on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." (Citation and punctuation omitted.) *First Financial Ins. Co. v. American Sandblasting Co.*, 223 Ga. App. 232, 232-233 (1) (477 SE2d 390) (1996). Additionally, "[b]ecause insurance policies are contracts of adhesion, drawn by the legal draftsman of the insurer, they are to be construed as reasonably understood by an insured." (Citation and punctuation omitted.) Id. at 232 (1). "[T]he test is not what the insurer intended its words to mean, but rather what a reasonable person in the insured's position would understand them to mean." (Citation and punctuation omitted.) *Western Pacific Mut. Ins. Co. v. Davies*, 267 Ga. App. 675, 680 (1) (601 SE2d 363) (2004).

Here, the exclusionary language relied upon by Sentry in denying Rentrite's claims under the policy bars coverage for only one of those claims, the one arising from the loss of the excavator. It is undisputed that, prior to renting the excavator to Pettiford, Rentrite did not obtain his driver's license number. Accordingly, exclusion B. 2. i. (7) excludes that loss from Policy coverage, and we affirm the trial court's grant of summary judgment in favor of Sentry with respect to that claim. The evidence of record further shows, however, that Rentrite's agent had obtained Pettiford's driver's license number by late February 2002 — i.e., before Rentrite rented Pettiford either the tractor or the backhoe. The trial court therefore erred in granting summary judgment in favor of Sentry as to these two claims, and we reverse the same.

2. We next turn to Rentrite's claims for bad faith. An insured cannot sustain a cause of action for bad faith where an insurer had "any reasonable ground to contest the claim" made under the insurance policy. (Citation omitted.) *Moon v. Mercury Ins. Co. of Ga.*, 253 Ga. App. 506, 507 (2) (559 SE2d 532) (2002). In light of our holding in Division 1, that Rentrite's loss of the excavator is excluded from Policy coverage, we affirm the trial court's grant of summary judgment on Rentrite's assertion of bad faith as to that claim. We reverse the grant of summary judgment, however, as to Rentrite's bad faith claims resulting from the denial of coverage for the loss of the tractor and the backhoe. Our finding that Rentrite may sustain a bad faith cause of action for these two claims is based, in part, on Sentry's misrepresentation of the terms of its insurance policy. Specifically, Sentry represented to its insured, to the trial court, and to this Court that the Policy required Rentrite to obtain a credit application from Pettiford and a copy of Pettiford's driver's license, and that Rentrite's failure to meet these requirements voided Policy coverage for the claims at issue. As the plain language of the Policy demonstrates, however, it contains no such requirements.

For the reasons set forth above, we affirm the trial court's grant of summary judgment in favor of Sentry on Rentrite's claims resulting from the loss of the excavator. We reverse, however, the grant of summary judgment in favor of Sentry on Rentrite's claims resulting from the loss of the tractor and the backhoe.

*Judgment affirmed in part and reversed in part. Blackburn, P. J., and Ellington, J., concur.*

DECIDED SEPTEMBER 23, 2008.

*Daniel L. Henderson,* for appellant.
*Eason, Kennedy & Crawford, Richard B. Eason, Jr., David S. Crawford,* for appellee.