**FIRST DIVISION
BARNES, P. J.,
BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**March 9, 2023**

# In the Court of Appeals of Georgia

A22A1630. ATLANTA POSTAL CREDIT UNION v. HOLIDAY et al.

BARNES, Presiding Judge.

Denicia R. Holiday, for herself and on behalf of a putative class of other persons similarly situated, sued Atlanta Postal Credit Union ("APCU") on breach of contract theories, complaining of the manner in which the credit union assessed overdraft fees ("OD Fees"). In this appeal, APCU challenges the denial of its motion to dismiss the complaint for failure to state a claim, and the grant of Holiday's motion for class certification. For the reasons that follow, we affirm.

In the complaint filed on August 6, 2020, Holiday alleged that at all times relevant, her checking account with APCU was governed by form documents drafted by APCU – (i) a Membership and Account Agreement; and (ii) a Courtesy Pay

Agreement (hereinafter, collectively, "Account Documents");[1] that the Account Documents also governed the accounts of other APCU members and amounted to a contract of adhesion; that the Account Documents provided that APCU would assess OD Fees only on – as Holiday described in her complaint – "actual overdrafts, e.g., transactions that actually overdraw the account"; that the Account Documents did not define "balance" or "overdraw"; that contrary to its promises, APCU employed a uniform policy and practice to disregard the actual amount of money in the account, and to use instead a manufactured balance for assessing OD Fees; that by using such calculation to determine whether to assess OD Fees, APCU increased the number of OD Fees it charged its accountholders; and that

> [t]his manufactured balance is not the official balance of the account and it is not the balance provided to accountholders in their monthly statements from APCU. As such, it is reasonable for Plaintiff and accountholders like her to interpret and understand APCU's use of the term "balance" as the official balance in the account, i.e., the actual money in the account. Plaintiff and Class members could not reasonably have expected that APCU would assess OD Fees in this manner.

_____

[1] Holiday, more specifically, alleged that she and APCU had contracted for bank account deposit, checking, ACH, ATM, and debit card services.

2

As an example of APCU's imposition of OD Fees on her own account, Holiday set out in the complaint:

APCU charged Plaintiff OD Fees on items that did not overdraw her account. For example, on April 2, 2019, Plaintiff was assessed a $32 Fee for a $50.00 Georgia ITS Tax transaction. This is despite the fact that, according to the bank statement issued by APCU, her account never went negative and always had sufficient funds to cover the transactions.

(Paragraph numbering omitted.) Holiday attached a copy of the Account Documents to her complaint as "Exhibit A."

Alleging that the lawsuit was proper for class treatment, Holiday proposed that the class of persons be defined as: "All APCU checking account holders in the state of Georgia who, during the applicable statute of limitations, were charged OD Fees on items that did not overdraw their checking accounts." Holiday further stated, "Subject to additional information obtained through discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint and/or at the class certification stage." And she "reserve[d] the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate."

3

In alleging breach of contract theories, Holiday claimed that APCU had breached the terms of the contract by charging OD Fees "on items that [did] not actually overdraw the account, i.e., when there were sufficient actual funds in the account to cover the item"; and that APCU had violated the covenants of good faith and fair dealing. Holiday sought judgment that provided, among other things, a declaration that APCU's fee policies and practices are wrongful, unfair and unconscionable; an injunction against APCU's polices and practices on OD Fees as challenged by the action; restitution of all wrongful OD Fees paid to APCU by plaintiff(s); actual damages in amounts to be proved; as well as pre- and post-judgment interest, attorney fees, and other costs of litigation. Holiday subsequently filed on December 20, 2021 a motion pursuant to OCGA § 9-11-23 seeking certification of a class defined as: "All current and former [APCU] accountholders in the state of Georgia who, from August 6, 2014 through August 31, 2021, were charged overdraft fees on items that did not overdraw their checking accounts."

Meanwhile, on October 6, 2020, APCU filed its answer denying that Holiday was entitled to any relief; APCU also filed a motion to dismiss the complaint under OCGA § 9-11-12 (b) (6).

4

On February 3, 2021, the trial court entered an order that denied APCU's motion to dismiss. And in light of Holiday's pending motion for class certification, the order expressly anticipated the start of "discovery germane to the issue of [class certification]."

During such discovery, APCU presented the affidavit of its Chief Risk Officer. She averred that "[e]very account at APCU is governed by the [Membership and Account Agreement]," and that "Exhibit A of the Complaint is a true and correct copy of an APCU Membership Agreement with those provisions applicable to the claims provided in this case." The Membership and Account Agreement contains a "Payment of Overdrafts" provision, stating:

> If, on any day, the available funds in your savings or checking account are not sufficient to pay the full amount of a check, draft, transaction, or other items, plus any applicable fee that is posted to your account, we may return the item or pay it, as described below. [APCU's] determination of an insufficient available account balance may be made at any time between the presentation and [APCU's] midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient available funds in order to pay an item. Your account may be subject to a charge for each item regardless of whether we pay or return the item.

It is uncontroverted that, at all times relevant, the Courtesy Pay Agreement provided, among other things, "An overdraft occurs when you do not have enough money in your account to cover a transaction, but APCU pays it anyway."

APCU's Chief Risk Officer stated further in her affidavit that APCU had sent "compliance updates" to its members concerning the assessment of overdrafts. As an example of one such "mass-mailed communication," the Chief Risk Officer attached to her affidavit a two-page form letter addressed to "Member" from APCU's Chief Operations Officer; placed within the text of one of the 15 bullet items set out on the second page, the following sentence can be found: "The available balance for checks, ACH items, and recurring debit card transactions is comprised of the current, or ledger, balance, less any holds on deposited funds and any debit card holds, plus the amount of the Overdraft Privilege limit and any available overdraft protection." APCU's Chief Risk Officer recounted in her affidavit that "[s]imilar letters" were sent on a quarterly basis.

APCU's Chief Risk Officer further averred that when an APCU member utilized overdraft protection, the member was sent a letter stating:

> Your MEMBER BENEFITS CHECKING available balance is not sufficient to cover the following: [description of overdrawn transaction]

6

for $ [amount of transaction]. This item has been paid through Courtesy Pay. After posting the withdrawal of $ [amount of transaction] and a fee of $32.00 was assessed, your balance is now $ [ledger balance] and your available balance is $ [available balance].

APCU's Chief Risk Officer further averred that APCU sent to its members account statements. As she described, "That final accounting at month-end is not a calculation of the member's available balance from which the member had funds available to clear transactions. It is a reconciled ledger balance calculated after all transactions have been processed."

On March 9, 2022, the trial court convened a hearing on the motion for class certification. At the hearing, APCU's counsel asserted that the proposed class was overly broad, overly inclusive, and indefinite. Additionally, APCU's counsel drew the court's attention to the "Payment of Overdrafts" provision of the Membership and Account Agreement, pointing out,

> [That provision] says, "If on any day the available funds in your savings or checking account are not sufficient to pay the full amount of a check, draft, transaction, or any other item, plus any applicable fee, we may return it or pay it . . . ." The important word here, of course, is "available funds." "Available" means something. . . .

APCU's counsel went on to state that "'available funds' in this contract is not defined," then proffered that the ordinary meaning of "available" could be ascertained from various dictionaries.

Furthermore, APCU's counsel cited what the Chief Risk Officer had described as "compliance updates." Reciting to the court the sentence quoted above, APCU's counsel contended that such language "expressly identifies, defines, and explains the use of the available balance, when it's used, and how to calculate it."[2] Counsel thus explained that for purposes of assessing OD Fees under the contract, "there's a difference between the 'available balance' and the 'ledger balance.'" Moreover, counsel asserted that the proposed class – which the lawyer recalled as "people who had overdraft fees that did not overdraw their checking accounts" – amounted to "an impossible to define term."[3]

Holiday's counsel summarized to the trial court that the "question for the trier of fact will be whether [APCU] breached its form contract when it assessed overdraft fees, based on account holders' available balance as opposed to their actual balance

_____

[2] APCU's counsel added, "We just explained how we're going to win on the merits[.]"

[3] In its appellate brief, APCU asserts that the definition of the proposed class is "circular," and thus "incapable of being ascertained."

or the ledger balance." And that question, Holiday's counsel maintained, should be resolved on a classwide basis.

On April 25, 2022, the trial court entered an order granting Holiday's motion for class certification. The court noted APCU's challenge to the proposed definition as overly broad and indefinite – specifically, what is meant by "overdraft fees on items that did not overdraw their checking accounts." However, the court discerned that the complaint, the motion for class certification, and the argument of Holiday's counsel made clear that the class definition encompassed those accountholders who were charged OD Fees on items that did not overdraw the actual/ledger balance in their checking accounts. Hence, for clarity, the trial court modified that proposed definition and certified a class defined as:

> All current and former [APCU] accountholders in the State of Georgia who, from August 6, 2014 through August 31, 2021, were charged overdraft fees on items that did not overdraw their checking account's actual/ledger balance.

This appeal ensued.[4]

---

[4] APCU has not enumerated a claim contesting the modification itself. See *Felix v. State*, 271 Ga. 534, 539, n.6 (523 SE2d 1) (1999) (reiterating that "if the assertion that a particular trial court ruling was error is not supported by argument or citation of authority, it is deemed abandoned under the rules of each of the Georgia

1. APCU contends that the trial court erred in denying its motion to dismiss pursuant to OCGA § 9-11-12 (b) (6), asserting that the trial court failed to enforce what it described as "contractual time-limitations" to give certain notices.

APCU's motion cited that the Membership and Account Agreement (a copy of which it acknowledged was attached to the complaint[5]) included in the "STATEMENTS" paragraph the following two provisions:

> **b. Examination.** You are responsible for promptly examining each statement upon receiving it and reporting any irregularities to us. If you fail to report any irregularity such as forged, altered, unauthorized, unsigned, or otherwise fraudulent items drawn on your account, erroneous payments or transactions, or other discrepancies reflected on your statement within 33 days of the date we sent the statement to you, we will not responsible for your loss. We also will not be liable for any items that are forged or altered in a manner not detectable by a reasonable person, including the unauthorized use of a facsimile signature machine.

---

appellate courts"; and that "an appealing party may not use its brief to expand its enumeration of errors by arguing the incorrectness of a trial court ruling not mentioned in the enumeration of the errors").

[5] See *Love v. Fulton County Board of Tax Assessors*, 311 Ga. 682, 683 (859 SE2d 33) (2021) ("In assessing whether a claim should be dismissed [for failure to state a claim], a court may consider exhibits attached to and incorporated into the complaint and answer. See OCGA § 9-11-10 (c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").").

10

**c. Notice to Credit Union.** You agree that the Credit Union's retention of checks or drafts does not alter or waive your responsibility to examine your statements or the time limit for notifying us of any errors. The statement will be considered correct for all purposes, and we will not be liable for any payment made or charge to your account unless you notify us in writing within the above time limit for notifying us of any errors. If you fail to receive a periodic statement, you agree to notify us within 14 days of the time you regularly receive a statement.

Given that language, APCU posited on motion to dismiss, Holiday's breach of

contract complaint

must allege facts showing that she complied with the time-limitation provision and all other conditions precedent. The only fact Plaintiff alleges with respect to OD Fees is that APCU assessed a $32.00 fee on April 2, 2019. Plaintiff, however, does not allege that she notified APCU in writing of the alleged improper fee as required by the Account Documents. Further, the Complaint itself cannot count as written notice to APCU since the Complaint was filed more than a year after the alleged fee. Given Plaintiff's failure to allege necessary facts, APCU respectfully requests that this Court dismiss the instant action with prejudice.

We find no error in the trial court's denial of APCU's motion to dismiss.

A motion to dismiss for failure to state a claim upon which relief may be granted should not be sustained unless (1) the allegations of the

complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought.

(Citation and punctuation omitted.) *Love v. Fulton County Board of Tax Assessors*, 311 Ga. 682, 683 (859 SE2d 33) (2021). "The appellate court reviews de novo the trial court's ruling on the defendant's motion to dismiss, accepting as true all well-pled material allegations in the complaint and resolving any doubts in favor of the plaintiff." (Citation and punctuation omitted.) Id.

While APCU contended in its motion that Holiday failed to specifically allege in her complaint that she satisfied the cited notice provisions, whether Holiday complied with such provisions – and even to the extent, if any, she was required to do so[6] – relate to a defense that APCU apparently believes is available to it. It is well

---

[6] Holiday has asserted, inter alia, that the cited provisions do not apply to the underlying claims and that no notice was required. She has also posited that the challenged fees were not "errors" or "irregularities," but instead were charged due to an intentional, uniform policy of assessing overdraft fees based on accountholders' available balances instead of the ledger balances, and that APCU "cannot seriously contend it needs notice that it erred[,] given that it intentionally programmed its systems to assess overdraft fees using the available balance." Additionally, Holiday has asserted that such a defense requires resolution of material issues of fact and law.

12

settled that "a plaintiff has no obligation to anticipate and plead away any defenses in [the] complaint. See OCGA § 9-11-8 (a) (2) (complaint requires "short and plain statement of the claims" and "demand for judgment")." *Speedway Motorsports v. Pinnacle Bank*, 315 Ga. App. 320, 323 (1) (727 SE2d 151) (2012). Indeed, APCU's argument disregards the principle: "[I]f the facts alleged in the complaint affirmatively prove a defense, a court may dismiss the complaint based upon the defense, but if the facts alleged in the complaint merely fail to affirmatively disprove a defense, no dismissal is warranted." Id. Accordingly, this contention provides no basis to disturb the judgment.

2. APCU contends that the trial court erred by granting class certification.

> The trial court is vested with broad discretion to decide whether to certify a class, and absent an abuse of that discretion, we will not disturb the trial court's decision. Implicit in this deferential standard of review is a recognition of the fact-intensive basis of the certification inquiry and of the trial court's inherent power to manage and control pending litigation. Thus, we will affirm the trial court's factual findings unless they are clearly erroneous. Under the clearly erroneous test, factual findings must be affirmed if supported by any evidence.

(Citations and punctuation omitted.) *Lewis v. Knology, Inc*., 341 Ga. App. 86, 87 (799 SE2d 247) (2017). "In determining the propriety of a class action, the first issue to be

13

resolved is not whether the plaintiffs have stated a cause of action or may ultimately prevail on the merits but whether the requirements of OCGA § 9-11-23 [ ] have been met." (Citation and punctuation omitted.) *Liberty Lending Svcs. v. Canada*, 293 Ga. App. 731, 735 (1) (668 SE2d 3) (2008). We turn to the statutory requirements for certifying a class under OCGA § 9-11-23.[7]

> As a first step in showing that class certification is warranted, a plaintiff must satisfy all of the threshold factors of OCGA § 9-11-23 (a), which provides:
>> One or more members of a class may sue or be sued as representative parties on behalf of all only if:
>> (1) The class is so numerous that joinder of all members is impracticable;
>> (2) There are questions of law or fact common to the class;
>> (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>> (4) The representative parties will fairly and adequately protect the interests of the class.

---

[7] See generally *City of Roswell v. Bible*, 351 Ga. App. 828, 831 (1), n.6 (833 SE2d 537) (2019) ("We look to federal cases interpreting Rule 23 of the Federal Rules of Civil Procedure, the rule upon which OCGA § 9-11-23 was based, for guidance.").

If the plaintiff can satisfy the numerosity, commonality, typicality, and adequacy of representation factors of OCGA § 9-11-23 (a), she must then satisfy at least one of the three requirements of OCGA § 9-11-23 (b) in order to show that class certification is appropriate.

*Bowden v. The Med. Center*, 309 Ga. 188, 193-194 (1) (b) (845 SE2d 555) (2020).

Pertinent to this case is OCGA § 9-11-23 (b) (3), which provides in part:

An action may be maintained as a class action if the prerequisites of subsection (a) of this Code section are satisfied, and, in addition: . . .The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

APCU contends that Holiday failed to satisfy these requirements of OCGA § 9-11-23: numerosity, commonality and predominance, typicality, and adequacy.[8] We address these requirements in turn.

(a) *Numerosity*. "[T]o satisfy this requirement, [a plaintiff] need not allege the exact number and identity of the class members, but must only establish that joinder is impracticable through some evidence or reasonable estimate of the number of

---

[8] APCU does not challenge the trial court's finding that the superiority requirement was satisfied.

15

purported class members." (Citation and punctuation omitted.) *Brenntag Mid South v. Smart*, 308 Ga. App. 899, 903 (2) (a) (i) (710 SE2d 569) (2011). See *City of Roswell v. Bible*, 351 Ga. App. 828, 834 (3) (833 SE2d 537) (2019) ("[P]arties seeking class certification do not need to know the precise number of class members but they must make reasonable estimates with support as to the size of the proposed class.") (citations and punctuation omitted).

Holiday estimated that the class would be comprised of thousands of APCU accountholders. In this regard, Holiday cited deposition testimony of APCU's Chief Risk Officer that APCU had approximately 102,000 members; that all members who opened an account at APCU were provided the same Membership and Account Agreement governing their respective accounts; and that she knew of no member who had been able to negotiate the terms of the Membership and Account Agreement. We find no abuse of discretion in the trial court's determination that the numerosity requirement was met, based on its finding that APCU had thousands of accountholders subject to APCU's standard "available balance" overdraft determinations and OD Fees assessments. See generally, e. g., *Stevens v. Thomas*, 257 Ga. 645, 649 (2) (361 SE2d 800) (1987) (noting that "[a] class consisting of as few as 25 persons has been found to be sufficiently numerous to maintain a class action");

16

*City of Roswell*, 351 Ga. App. at 833 (3) (reciting that "impracticability of joinder is generally presumed if the class includes more than 40 members") (citation and punctuation omitted); *Sta-Power Indus. v. Avant*, 134 Ga. App. 952, 954-955 (1) (216 SE2d 897) (1975).[9] This contention presents no basis to disturb the judgment.

(b) *Commonality and Predominance*. "To establish the requisite commonality, the Plaintiff[] must show the existence of common questions of law and fact." *Brenntag Mid South*, 308 Ga. App. at 903 (2) (a) (ii). And OCGA § 9-11-23 (b) (3) requires that common questions "predominate over any questions affecting only individual members."

> The Rule 23 (b) (3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. Class plaintiffs may satisfy this requirement by showing that issues subject to class-wide proof predominate over issues requiring proof that is unique to the individual class members. In considering whether common questions will predominate, we look to the specific claims asserted.

---

[9] Cf. *American Debt Foundation v. Hodzic*, 312 Ga. App. 806, 809 (1) (720 SE2d 283) (2011) ("[W]hile it is true that numbers as small as 25 and 40 have been deemed sufficiently large to warrant class actions, we simply cannot say that [plaintiff] has shown that a class of nine total members satisfies the numerosity requirement of OCGA § 9-11-23 (a) (1).") (citation and punctuation omitted).

(Citations and punctuation omitted.) *City of Roswell*, 351 Ga. App. at 831 (2).

Addressing the pertinent issues, then determining that the commonality and predominance requirements were both satisfied, the trial court found in its order:

> [T]he common, predominating issue is whether APCU's overdraft fee assessment practice breached its contract. Georgia law will apply to the entire class. The factual and legal issues are based on a common nucleus of operative facts under Georgia contract law. The common legal issue – whether Defendant's method of calculating overdraft fees breached their account agreements – predominates over individual billing and claim differences. The key evidence is the same for Plaintiff and each proposed class member: (1) APCU's Account Documents, with identical terms, applicable to Plaintiff and Class members; (2) APCU's uniform assessment of overdraft fees on transactions; and (3) the damages incurred. Because the contract and method of APCU's alleged breach is the same as to all accountholders, common issues predominate over any purported individual issues.

We find no abuse of discretion in the trial court's determinations. Indeed, "[this Court has] previously held that . . . claims arising from the breach of a single contract present a classic case for treatment as a class action." *City of Roswell*, 351 Ga. App. at 832 (2). See, e.g., id. at 831-832 (2) (concluding that, where each of the class members' claims arose out of identical terms in a policy manual and each of their claims were brought under the same causes of action, the issue of the defendant's

18

contractual liability would be determined on a class-wide basis); *Unum Life Ins. Co. of America v. Crutchfield*, 256 Ga. App. 582, 583 (568 SE2d 767) (2002) ("Georgia case law provides that common questions of law and fact predominate when an action is brought on behalf of purchasers of agreements from a common source, the character of the right to be enforced is common, and common relief is sought.") (citations and punctuation omitted). See also, e.g., *Venerus v. Avis Budget Car Rental*, 723 F.Appx. 807, 815 (II) (B) (2) (11th Cir. 2018) ("[F]orm contracts are ideal for class treatment.").

APCU contends that the issue whether a particular accountholder gave requisite notice under the Agreement will require individualized proof such that the trial court abused its discretion in granting class certification.[10] But as the trial court

[10] APCU cites, e. g., *Tanner v. Brasher*, 254 Ga. 41, 45 (2) (326 SE2d 218) (1985) (concluding in a land dispute between a purported class of Sapelo Island landowners and State officials that class certification was inappropriate because three issues would play "such an integral part in the determination of liability": (i) the extent of the State officials' interference with the access of each plaintiff to real estate on Sapelo Island; (ii) the validity of the claim of right and chain of title for each alleged class member; and (iii) the nature of the State's possession relative to each class member). Notably, in *Tanner*, the State officials had sought summary judgment, and the Supreme Court of Georgia affirmed the trial court's denial of the State officials' motion on immunity grounds, and remanded the case for the trial court to determine the validity of the State officials' assertion that the State owned the disputed land, the scope of the officials' authority, and the parties' rights and liabilities. Id. at 44 (1).

aptly noted, "as long as common issues predominate, a class may be certified even if some individual questions of law or fact exist." (Citation and punctuation omitted.) *Liberty Lending Svcs.*, 293 Ga. App. at 738 (1) (a). While lack of requisite notice is apparently an anticipated defense,[11]

> we need not resolve the issue of [notice] at this juncture because merit-based disputes are not ripe for resolution at the class certification stage, particularly where no dispositive motions have been filed, argued, or ruled on below, and merits discovery has not concluded.[12] Moreover, where corporate policies constitute the very heart of the plaintiffs' claims, as they do here, common issues will predominate because those policies would necessarily have to be re-proven by every plaintiff. Thus, even where a defense may arise and may affect different class members differently, this occurrence does not compel a finding

---

In the instant case, the record does not reflect, and the parties do not assert, that any motion for summary judgment has been pursued.

[11] In its appellate brief, APCU states, "[T]he failure to give notice is certainly a defense that APCU has raised, and will continue to raise."

[12] See generally *J.M.I.C. Life Ins. Co. v. Toole*, 280 Ga. App. 372, 378 (2) (c) (634 SE2d 123) (2006) (emphasizing that "certification orders are 'inherently tentative,' and [that] the trial court retains jurisdiction to modify or even vacate them as may be warranted by subsequent events in the litigation") (citations omitted); OCGA § 9-11-23 (c) (1) ("As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subsection may be conditional, and may be altered or amended before the decision on the merits.").

that individual issues predominate over common ones. So long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification.

(Citations, punctuation, and footnote omitted.) *City of Roswell*, 351 Ga. App. at 832-333 (2).

As we have expressed above, "[f]inding whether common issues predominate over individual issues is a determination within the sound discretion of the trial judge." *Fortis Ins. Co. v. Kahn*, 299 Ga. App. 319, 323 (2) (a) (683 SE2d 4) (2009). Given the record before us, we cannot say that the trial court abused its discretion with respect to its commonality and predominance determinations. See *City of Roswell*, 351 Ga. App. at 832-833 (2) (concluding that the trial court did not abuse its discretion in finding that individual considerations did not predominate over those issues relevant to the entire class); *Resource Life Ins. Co. v. Buckner*, 304 Ga. App. 719-721, 730-731 (3) (a) (698 SE2d 19) (2010) (upholding nationwide class certification, where each of the putative class members purchased an identical credit insurance policy from the defendant, each was owed a refund of unearned premium, and each claimed that the defendant had breached its contractual and legal duties by failing to pay that refund; thus, rejecting defendant's arguments that common facts

21

and questions of law did not predominate over multiple alleged variances); *Village Auto Ins. Co. v. Rush*, 286 Ga. App. 688, 690-691 (1) (649 SE2d 862) (2007) (concluding that common questions of law predominated, where claims focused on "standard practices and documents, not on facts individual to each class member"); *Unum Life Ins. Co. of America*, 256 Ga. App. at 583 (upholding, as an authorized use of discretion, the trial court determination that common questions of law or fact predominated over individual questions, where the case presented both "a significant common issue of fact" and "individual issues of law");[13] see generally *Griffin Indus. v. Green*, 297 Ga. App. 354, 355-356 (2) (677 SE2d 310) (2009) (affirming, under abuse of discretion standard of review, the trial court's decision to certify class, while noting that under a de novo standard, the outcome of the appeal may have been different).

We have thus found no merit in APCU's challenge to the trial court's determinations, on the ground that its accountholders could select one of three types of overdraft protection – namely, (i) no protection; (ii) standard protection; and (iii)

---

[13] See also, e. g., decisions from federal district courts within the Eleventh Circuit that granted class certification under Fed. R. Civ. P. 23, in connection with banks' assessments of overdraft fees: *In re Checking Account Overdraft Litigation*, 307 FRD 656, 683 (SD Fla. 2015); *In re Checking Account Overdraft Litigation*, 286 FRD 645, 661 (IV) (1) (SD Fla. 2012).

enhanced protection. Although APCU contends that the "class certified by the trial court fails to account for the differences between those accountholders who have opted-out of all overdraft coverage, those who have the standard coverage, and those, like Holiday, who have oped-in extended coverage," APCU has failed to show that any difference among those three categories had any material bearing on the contested calculation of OD Fees – when/if such fees were assessed. Rather, APCU posits in its appellate brief that "[e]very deposit account at APCU is governed by APCU's Membership and Account Agreement (the 'Agreement')"; that the "Agreement that was in effect during the relevant time period [is] found at [Exhibit A of the complaint]"; and that an "overdraft occurs when 'the available funds' in the member's account are 'not sufficient to pay the full amount of a check, draft, transaction, or other item . . .'" (Emphasis omitted.) Given all the foregoing circumstances, APCU has failed to establish that the trial court erred in its conclusion that the cited categories of overdraft protection did not defeat Holiday's showings of commonality and predominance. Accord *Resource Life Ins. Co.*, 304 Ga. App. at 731 (3) (a) (determining that the asserted factual variations were not "sufficient to preclude class certification[,] . . . because they do not represent variations that would have any legal

23

significance – i.e., they would not necessitate the application of a different set of legal principles").

Finally, APCU has demonstrated no merit in its claim that commonality and predominance were destroyed for the reason that, as it contends, individualized inquiries are needed to ascertain the intent of Holiday and each class member with respect to the underlying contract. We agree with Holiday that "[i]ntepreting APCU's form contract is a question that should be answered on a class-wide basis." See *Resource Life Ins. Co*., 304 Ga. App. at 729 (3) ("[C]laims arising from interpretation of form agreements are considered to be 'classic' cases for treatment as a class action.") (citation and punctuation omitted). As the trial court correctly reasoned,

> Any individualized evidence of consumer expectation or damages does not impact the construction and application of the Account Documents. Moreover, such potential differences do not negate that the main dispute in this action concerns whether APCU's *standard* practice was violating terms of APCU's *standard* contract. Thus, the Court finds that the commonality and predominance requirements are both satisfied.

(Emphasis supplied.) [14]

---

[14] See generally *In re TD Bank, N.A. Debit Card Overdraft Fee Litigation*, 325 FRD 136, 157 (B) (i) (a) (D SC 2018) ("If there is any type of standardized agreement that ought to be interpreted uniformly, without regard to the non-drafting party's

(c) *Typicality*.

The typicality test centers on whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named class plaintiffs, and whether other class

---

idiosyncratic comprehension of its terms, it is a consumer checking account agreement. Here, the same overdraft accounting policy was applied to every TD Bank customer whether he or she understood the role of available balance entirely, partially, or not at all, and irrespective of whether the customer's understanding changed during the relevant time period. . . . In this context, the focus is on the Bank's conduct in relation to the contractual language, and individual customers' 'intent' and 'course of performance' is largely irrelevant to resolving any ambiguity."); and see, e.g., *Gillis v. Respond Power*, 677 F.Appx. 752, 756 (III) (3d Cir. 2017) ("In the context of standard form contracts . . . extrinsic evidence of individual understandings is especially irrelevant."); *Kolbe v. BAC Home Loans Servicing*, 738 F3d 432, 440 (IV) and n. 7 (1st Cir. 2013) (reciting that "[b]ecause uniform contracts are interpreted uniformly across cases whenever it is reasonable to do so, extrinsic evidence about what a particular party intended or expected when signing the contract is generally irrelevant," and further collecting cases upholding that principle); *Sharon Steel Corp. v. Chase Manhattan Bank*, 691 F2d 1039, 1048 (1) (2d Cir.1982) (in analyzing a bank contract, determining that "[b]oilerplate provisions are . . . not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture"). Accord *Rentrite, Inc. v. Sentry Select Ins. Co.*, 293 Ga. App. 643, 647 (1) (667 SE2d 888) (2008) (reciting the principle that "because insurance policies are contracts of adhesion, drawn by the legal draftsman of the insurer, they are to be construed as reasonably understood by an insured" – that is, "what a reasonable person in the insured's position would understand them to mean") (citation and punctuation omitted); *Walton Elec. Membership Corp. v. Snyder*, 226 Ga. App. 673, 678 (2), n. 6 (487 SE2d 613) (1997) ("[A] contract of adhesion . . . has been defined as a standardized contract offered on a 'take it or leave it' basis and under such conditions that a consumer cannot obtain the desired product or service except by acquiescing in the form contract.").

25

members have been injured by the same course of conduct. This test is not demanding and is satisfied if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.

(Citations and punctuation omitted.) *City of Roswell*, 351 Ga. App. at 834-835 (4). "Thus, typicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large. A sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory." (Citations and punctuation omitted.) *Brenntag Mid South*, 308 Ga. App. at 904 (2) (a) (iii).

Here, the trial court found that typicality was satisfied:

Plaintiff's claims are the same as the rest of the Class. Plaintiff's claims arise out of the same conduct and are based on the same legal theory as the Class – that APCU breached its contract when it made overdraft determinations using the available balance instead of the actual balance. There is nothing atypical about Plaintiff's claims, as she and each Class member were subject to the same contract and overdraft fee calculation practice during the Class Period.

With respect to the typicality determination, APCU has demonstrated no abuse of discretion. APCU re-asserts that Holiday failed to give timely notice, and it claims

26

that its defenses against Holiday are "unique." But "it is clear that [Holiday's] breach of contract claims . . . are virtually identical to the claims of each proposed class member. And for the reasons discussed in Division 2 [(b)], we need not reach the merits of [APCU's anticipated notice] defense at this juncture." *City of Roswell*, 351 Ga. App. at 835 (4) (noting the principle that "[t]he typicality requirement may be satisfied despite substantial factual differences when there is a strong similarity of legal theories") (citation and punctuation omitted).

APCU asserts further that it adduced evidence showing that Holiday did not sufficiently read the contract; according to APCU, that evidence supports a "unique" defense against Holiday such that typicality is destroyed. But APCU has failed to show that Holiday's failure to fully read the contract, even if true, could have any significance here on the breach of contract claims. The law in Georgia generally binds all who can read to the terms of the contract, regardless of whether they actually read it. See *Stamps v. JFB Properties*, 287 Ga. 124, 126 (694 SE2d 649) (2010) (reciting the general rule that "[a] person is bound by any contract he signs without reading"); *Arko v. Cirou*, 305 Ga. App. 790, 793 (1) (700 SE2d 604) (2010) ("The rule in this state is that where one who can read signs a contract without reading it, he is bound by the terms thereof[.]") (citation and punctuation omitted). Hence, this challenge by

27

APCU fails. See generally *Fortis Ins. Co.*, 299 Ga. App. at 324 (2) (c) (upholding class certification, where "appellants do not provide evidence showing that any potential defenses would yield a different result for any class member").

(d) *Adequacy*.

> OCGA § 9-11-23 (a) (4) provides that one or more members of a class may sue as representatives of the class if "[t]he representative parties will fairly and adequately protect the interests of the class." The so-called adequacy requirement is intended to protect the legal rights of absent class members. Thus, in assessing the adequacy of the class representatives, a trial court should examine whether the representatives' attorneys are experienced and competent in the legal issues involved. Additionally, the court should ensure that the interests of the proposed representatives are not antagonistic to the interests of the proposed class.

(Citations and punctuation omitted.) *EndoChoice Holdings v. Raczewski*, 351 Ga. App. 212, 215 (1) (830 SE2d 597) (2019).

The record here includes evidence of the backgrounds of Holiday's counsel, as well as evidence of Holiday's knowledge of and her participation in the litigation. The trial court found that Holiday's counsel satisfied the requirements, based on their practice, experience, and demonstrated knowledge in this case; and that Holiday's interests aligned with the rest of the class. Although APCU contends that the trial

28

court erred in its conclusion that Holiday is an adequate representative, it has cited no evidence demanding a different ruling. And "we find no abuse of discretion in the trial court's ruling that [Holiday is an] adequate representative[ ] of the class." *EndoChoice Holdings*, 351 Ga. App. at 218 (1). Consequently, this challenge to the judgment is unavailing.

*Judgment affirmed. Brown and Hodges, JJ., concur.*